# CASES

## ARGUED AND DETERMINED

IN THE

## UNITED STATES CIRCUIT COURTS OF APPEALS, THE DISTRICT COURTS, AND THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA

---

### MUNRO, Trustee, v. SMITH et al.

(Circuit Court of Appeals, First Circuit. June 18, 1919.)

No. 1359.

1. APPEAL AND ERROR ⊜1008(3)—REVIEW—FINDINGS.

Where the case turned on admitted facts, the inferences therefrom, and on the interpretation of written evidence, the usual rule that appellate court will give great consideration to conclusion of trial judge does not apply.

2. TRUSTS ⊜110—CONSTRUCTIVE TRUSTS—EVIDENCE—SUFFICIENCY.

In a suit by the trustee of a bankrupt mining company against stockholders and officers of the company on the theory that directors and stockholders who had acquired title to mining claims which the company was developing under an option contract to purchase and who were working in connection with the manager of the company who expected to acquire its valuable personal property by enforcing his claim for salary, evidence *held* to establish a conspiracy to wreck the company and to furnish basis for the enforcement of a constructive trust; the parties to the conspiracy acting in violation of the relation of trust.

3. CORPORATIONS ⊜308(1)—MANAGER—RIGHT TO COMPENSATION—IMPROPER CONDUCT.

If a manager of a mining company, the scene of whose operations were in a state far distant from that in which the stockholders and directors resided, rendered no faithful service to the company and joined with stockholders and directors all of whom were maneuvering to get the property away from the company for their own benefit, there can be no recovery for services after the time the agent joined in the conspiracy.

4. CORPORATIONS ⊜183—STOCKHOLDERS—ACQUISITION OF PROPERTY—CONSTRUCTIVE TRUSTS.

Where stockholders of a mining company, which was in possession of a claim under an option contract of purchase allowing the company to abandon the purchase on forfeiture of payments made, secretly acquired the claim and concealed that fact from the company, accepted payments, and later declared a forfeiture for nonpayments, *held*, that the stockholders some of whom had been directors could not justify the secrecy on the theory that until they had been paid the full amount which they paid for the claim they were entitled to conceal the true situation, but such stockholders are immediately responsible for their fraud.

---

⊜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

259 F.—1

Appeal from the District Court of the United States for the District of Rhode Island; Arthur L. Brown, Judge.

Bill by Arthur E. Munro, trustee, against Fred L. Smith and others. From a decree for defendants (243 Fed. 654), complainant appeals. Reversed and remanded, with directions.

Harry M. Holbrook, of Providence, R. I., for appellant.

Richard E. Lyman, of Providence, R. I. (Lyman & McDonnell and Thomas F. I. McDonnell, all of Providence, R. I., on the brief), for appellees.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge. This is an appeal from a decree of the District Court for the District of Rhode Island, dismissing with costs a bill brought by Arthur E. Munro, trustee in bankruptcy of the Big Chief Mining Company, adjudicated bankrupt August 24, 1915, in said District Court. The defendants are Fred L. Smith, formerly a director and now a stockholder and creditor; Charles J. Davol, also a stockholder and creditor—both citizens of Rhode Island. Mary H. Carroll, executrix under the will of Thomas A. Carroll, was originally named a defendant, but during the trial the bill was, by a consent decree, conditionally dismissed as to her.

Frederick E. Browne, a citizen of California and a mining engineer, where he was resident general manager of the bankrupt's mining property as well as statutory agent, was named as a defendant but was not served. He did, however, attend as a witness and testify.

The bill alleges fraud, collusion, and conspiracy on the part of Smith, Davol, Browne, and Carroll, deceased—in which fraud breach of fiduciary duty plays a large part—to obtain the bankrupt's property for themselves.

The trial in the District Court went upon the theory that the plaintiff's right of recovery should first be determined, leaving, if the bill should be sustained, the question of the amount of damages and the nature of the relief, for subsequent consideration. As that court found no liability the case was really only partially tried.

The pleadings are long, covering, with their annexes, 90 printed pages. Both the bill and the answers are argumentative. There is little dispute as to basic facts. The defendants' counsel admit performance by the defendants of practically all the substantive acts stated in the bill.

The evidence is also bulky, covering nearly 300 pages besides corporation records not printed. Most of this evidence, however, consists of correspondence between the parties during the period of the transactions in question. The parol evidence adduced before the District Court is of minor significance.

[1] The case must turn upon the admitted facts, the inferences therefrom, and upon the interpretation of written evidence, in considering which, of course, the District Court had no substantial ad-

vantage over this court. The usual rule of giving great weight to the conclusions of the trial judge who observed the appearance and the manner of the witnesses is not, therefore, to any substantial degree, applicable in this case. As we are not able to adopt the views of the District Judge, it is necessary to deal in considerable detail with the evidence and necessary inferences therefrom.

The bankrupt is an Arizona corporation, a successor of the California Big Chief Mining Company, a California corporation. The earlier company on May 14, 1910, made a contract with W. Mack Foster and Lee W. Foster, owners of a two-thirds undivided interest in certain mining claims called the Jumbo claims, and with Pat and Lulu McCluskey, owners of the other one-third undivided interest, by which the corporation became entitled to purchase these claims located at Hart, Cal., for $50,000, paying therefor out of the net returns of mining in monthly installments arranged upon a sliding scale, but with a guarantee of certain minimum monthly payments which, from January, 1911, were required to be at least $450 a month. Nonpayment of the monthly installments after 30 days' notice grounded forfeiture of·the company's rights under the contract.

The company did not agree to pay this full amount of $50,000, but had the right to abandon, and in case of abandonment, or forfeiture, was entitled to remove the mill, machinery and mining tools used by it on the property described. The bankrupt also owned, or had rights in, certain other claims called the Fairview group and the Oro Belle No. 2; but these claims do not seem to have been regarded as of great importance. The main reliance for financial success was upon the acquisition and development of the Jumbo claims.

In July, 1913, the bankrupt had some 300 stockholders, about 100 of whom are referred to as the chief stockholders. From most of these chief stockholders money had been borrowed on time notes referred to as debenture notes. Into this mining enterprise there appears to have gone about $140,000 in cash. This investment was represented in July, 1913, by outstanding stock of the par value of something over $1,600,000, and by debenture notes of $36,487.83 owing its chief stockholders. Debts to outsiders, not including Browne's salary claim of $886.09, amounted to only about $2,300. Its assets consisted of its mining claims, and a mill and other mining implements on the Jumbo group into which appears to have gone about $27,000. The value of the mining claims was, of course, problematical. They are referred to as a prospect and "not a poor man's prospect." The mill had, in 1913, been put in operation; but the results were disappointing; its operation did not produce sufficient profits to pay operating expenses and the accruing payments under the Foster-McCluskey contract. New capital was therefore needed to develop the claims.

The financial status thus outlined remained substantially the same up to the time of the bankruptcy in August, 1915, except that the debenture notes, including apparently some accruing interest, had increased on August 23, 1915, to $57,319.41. Browne's claim for salary was then about $4,000. But within this period of about two years

18 additional payments of $450 each seem to have been made for the Jumbo claims under the Foster-McCluskey contract; so that, theoretically at least, the bankrupt's interest in its mining property had been increased. The company's debts except to its larger stockholders were, during the entire period, almost negligible. Most of the chief stockholders appear to have been resident in Rhode Island and in Massachusetts.

[2] We have, then, the common case of a mine in the West, mainly owned and financed by eastern investors, who were at the same time creditors and stockholders. The enterprise was embryonic; additional capital and successful development thereby was essential to save the investment already made.

The defendant Browne was a mining engineer, and was appointed resident manager in March, 1912. Whether he was the original promoter of these mining enterprises does not clearly appear. The directors of the corporation were all resident in Rhode Island or in Massachusetts. Browne was the only official on or near the company's property. Upon him as the resident manager the bankrupt and its board of directors 3,000 miles away relied and had a right to rely. In May, 1912, Browne was also appointed under a California statute disbursing agent and agent for the acceptance of service, and held these two positions until the adjudication in bankruptcy on August 24, 1915. The defendant Smith had been a director of the enterprise from February, 1910, and remained a director until May, 1914. His resignation was accepted on May 19, 1914, and on that date Carroll was elected, at Smith's request, as his successor. Carroll was a practicing attorney in Providence, and acted as counsel for the company. Counsel for the defendants deny that he was under any general retainer. He was one of two attorneys whose names appear on the letter head of the company, Exhibit 14. He appears to have been, during the period in question, the only counsel generally relied upon by the officers and directors of the company for advice and assistance in the East. It fairly appears that he expected the company to consult him on any questions which could be dealt with by eastern counsel. He was the company's attorney; whether its "general attorney" is immaterial. Charles J. Davol was a substantial business man in Providence and one of the chief stockholders and creditors of the company. Smith and Carroll were also substantial stockholders and creditors. John M. Welch was one of the directors referred to as "fiscal agent," and seems to have been the most active of the directors in raising money for the enterprise.

Smith, Carroll, Davol, and Browne were friends. In the late summer and early fall of 1913, Browne was in Providence and in conference with the officers and directors of the company, including Smith and Carroll, as to its condition and prospects. There is nothing in the record showing just what conversation took place between him and Smith at that time; but after his arrival in Hart, Cal., on October 23, 1913, he wrote Smith that the mill was still running but not on full time, and:

"I will keep you fully advised as the development progresses, having in mind the deal we talked over with Mell Church. I see an opportunity to make a wonderful thing out of this mine: I feel so absolutely sure that we are going to develop a big property that I would be quite willing and anxious to invest my personal funds in it, provided they were of sufficient extent that I could see the proposition through. I can safely assure you that you will not take any chance in financing and buying out the McCluskey-Foster interests."

From this and from the admissions in the answers and from other correspondence and evidence, it clearly appears that Browne, the general manager of the company, while in Providence in 1913, told Smith, one of the directors, that the Foster-McCluskey interests could be bought in at much less than the contract price and discussed with him some "deal." Instead of disclosing this situation, as in duty bound, to the officers and directors of the company, he entered into private negotiations with Smith, one of the directors, to buy it in for themselves and their associates in the scheme. Smith in some form of words authorized him to enter into negotiations with Foster and McCluskey to buy in, at a greatly reduced price, their rights in the Jumbo claims.

The negotiations with the Fosters succeeded. If the company had continued its payments under the outstanding contract, the Fosters would have been entitled to receive $21,433.32. In January, 1914, as a result of the negotiations through Browne and certain intermediaries whom he employed, $5,500 was paid to the Fosters for their two-thirds undivided interest. Carroll, then attorney for the company and also attorney for Smith, furnished $1,500 of this total consideration of $5,500. Carroll also advised as to the negotiations and arranged that the Fosters' interest should be deeded to one Fay, a friend of his, to hold for the benefit of Smith, $40/55$, and of him, Carroll, $15/55$. The deed to Fay was executed on January 30, 1914.

Eleven $450 payments were thereafter made. Two-thirds of these were remitted, through the California Bank through which the payments were made, to Fay, and immediately turned over by Fay to Carroll, who divided it between himself and Smith in the proportion of 15 to 40.

Smith, Browne, and Carroll carefully concealed this purchase from the other officers and directors of the company. Smith also authorized negotiations for a purchase of the McCluskey interests at about the same proportionate rate. But the McCluskeys refused to sell. The correspondence between Smith in Providence and Browne in Hart, Cal., disclosed various schemes on their part to force the McCluskeys to sell out on their terms. Among other plans they discussed compelling the McCluskeys to furnish a bond guaranteeing their financial responsibility. They also discussed the position they could put McCluskey in if Fay, who was acting for them, should at their suggestion refuse to join with McCluskey in giving notice of forfeiture in case the company should default on its monthly installments. While nothing came of these tentative schemes for unfairly crowding the McCluskeys out of their rights, the evidence is indicative of the business methods and ethical standards of the parties to this unpleasant correspondence.

That both Browne and Smith were fully conscious of their fiduciary obligation to give the corporation of which they were officers the benefit of the Foster purchase abundantly appears, inter alia, in a letter from Browne to Smith dated February 26, 1914. He says:

"In your letter of the 9th you suggest that if the interest were yours you would not be in a hurry to turn it over to the company. Candidly I have no such intention."

Their plan contemplated alternative future conditions:

First. If the company should continue making these monthly payments to the full amount of $50,000, they intended, through their ownership of the Foster interest, to make a large secret profit. As Smith and Carroll held debenture notes, as did the other larger stockholders, this secret profit would pay those notes and more besides. If, thereafter, the company should fail, they would, through this scheme, as creditors, get a preference over other creditors having like rights. This was one aspect, not remotely possible, of the scheme they devised. Cf. 10 Cyc. p. 803.

Second. If the company should fail to raise, either out of the proceeds of operation, by additional sales of stock or by flotation of notes among its stockholders, money sufficient to continue the payments under the Foster-McCluskey contract, then, through forfeiture of that contract, Smith and Carroll would become the owners of two-thirds of the Jumbo claims. But as under the contract the mill and other mining property might be removed, it was necessary for the complete success of their scheme to supplement the Foster purchase by some method of getting title to this mill. For this they thought they might use Browne's accruing claim for salary at the rate of $300 a month in cash (besides a certain additional amount payable in stock). As early as March 12, 1914, their plan to thus get title to all of the bankrupt's property was fully formulated. On that date, Browne, in California, wrote Smith in Providence at length, and, after discussing the prospect of buying in the McCluskey interest, said:

"My other account of $2,112.96 is the balance I have due me on account of my cash salary, that I have not drawn. In order to let this item reach the amount it has, I do not want you to think it is profit from my stay in Hart, on the other hand, I have had to draw upon other resources in order to pay my actual living expenses. If I did not have some money of my own before coming to Hart, I would have found myself in one hell of a boat, as it is has been impossible for me to draw anything without letting the men or bills go unpaid. You may also rest assured that I think the property is good for the amount or I would have folded my tent and left some time ago. Unless things take a change you may rest assured that I will be the owner of the mill and machinery and you will own the mine.

"This account is another reason why there should be a reorganization: If I turn my stock holdings into a new company and pay the assessment from what I have due me, it lessens my account just that much. It does not seem to dawn upon Mr. Allen and Mr. Welch that there is a certain fixed expense which continues all the time whether the mill is operating or idle."

This single sentence, "Unless things take a change you may rest assured that I will be the owner of the mill and machinery and you will own the mine," shows, particularly when buttressed as it is but-

tressed by much other corroborative correspondence, a definite, fraudulent plan by this general manager and this director to use their fiduciary positions for the purpose of despoiling the company they were bound to protect and serve. Carroll was also a party and intended profit sharer in the scheme.

Meantime, in the spring and early summer of 1914, Browne submitted to the board of directors estimates of the amount of money necessary to put the mill in operation and provide working capital. Attempts were made by Welch and Allen, who was president of the company, to raise the $10,000 to $20,000 stated by Browne to be necessary for these purposes. While the evidence does not clearly warrant a finding of bad faith on Browne's part as to these recommendations, yet, when we consider that he was at this time really acting in conspiracy with Smith and Carroll for the purpose of acquiring the entire property for the benefit of themselves (and a little later for Davol), we should not be warranted in finding that this plan represented his real judgment as to the best method of financing and operating the mine for the benefit of its entire body of creditors and stockholders. He had embarked on an adverse enterprise. He was managing really for Smith, Carroll, and himself—not for the company whose nominal manager he was.

Plans for raising additional capital did not succeed. Just why they failed does not clearly appear. But it does clearly appear that one natural and inevitable result of Director Smith's secret plan to act against his company and not for it was his refusal to meet and confer with Director Welch, who was the most active in attempting to raise the supposedly needed additional capital. As early as February 4, 1914, Smith, in Providence, writes Browne, in Hart, that—

"Mr. Carroll and I have talked over matters from time to time. * * * Have not seen Welch for three weeks and do not know how he is getting along. I have kept away from him as I have expected if I did see him he would ask me about our matter and I wanted to keep it quiet until it was all over. Can see no reason why he should suspect anybody unless it comes out through the Fosters or McCluskey."

The language "to keep it quiet until it was all over" obviously refers to the same plan referred to by Browne when he said, "Unless things take a change you may rest assured that I will be the owner of the mill and machinery and you will own the mine."

On May 21, 1914, Smith in Providence writes Browne at Hart that his resignation from the board of directors was accepted "and Mr. Carroll elected in my place." He states further that when he sent in his resignation to Mr. Allen, the president of the company, the president held it over "hoping he could get me to remain on the board and not have anything go any further, but I told him there was nothing doing as I wished Mr. Carroll to take my place, as it was not possible to increase the board to over seven and there was nobody else whom I wanted to resign outside of Shaw and Welch, and, of course, they did not want to do it so I thought the best way to do was for me to resign and have Carroll represent me."

This quotation and other language bearing the same implication shows that Smith was fomenting, or intended to foment, discord in

the board of directors in order to conceal his real relation to the enterprise and his intended subsequent action as to assisting in raising additional funds needed to prevent forfeiture of the Jumbo claims and to provide working capital. Success in raising working capital could not fairly be expected under such circumstances.

Carroll took Smith's place on the board of directors, fully conversant with the situation. That he acted there for Smith, Browne, and himself (later for Davol also), and not for the corporation, is the inevitable inference.

That the money to try out the value of the company's contingent rights in these mining claims might have easily been raised, if Smith, Browne, and Carroll had acted in good faith, seems beyond question. The effect of the withdrawal of Smith's assistance because of his adverse interest is indicated, inter alia, by what he said in his letter of May 21, 1914, to Browne:

"Stearns" (another director) "is very much interested and, in fact, he and I together raised in fifteen minutes $3,250 towards the $15,000.00 and if he and I put our shoulder to the wheel there is no chance but what we can raise the money, but we do not propose to raise it and carry everybody as it is not fair, so please try to be patient."

Lest this be misunderstood, we add that there is no indication that Stearns was in any way a party to the fraud or acting in other than entire good faith.

Whether Browne was also holding up operations at the mill as a part of the plan is not free from doubt. Even Smith, in a letter to Browne, said:

"Of course I do not understand really why you could not start up and run out enough stuff to get your pay or to help raise the $15,000."

The truth probably is that Smith, Carroll, and Browne were at that time willing that the other creditors and stockholders should raise money enough to continue payments under the Foster-McCluskey contract; but they apparently preferred that the enterprise should not be a large and demonstrated success. The evidence as a whole forces to the conclusion that they thought their profits from their scheme would be larger if they got the entire property instead of realizing merely the profits accruing under the contract from the secret purchase of the Foster interest. Moreover, they probably all recognized that, if the enterprise succeeded, Smith's purchase would ultimately be disclosed and they held accountable for their secret and fraudulent profits; whereas, if a forfeiture was declared and Browne got title to the mill and other property on execution sale, the chances of any creditors or stockholders pursuing them would be comparatively slight.

In June, 1914, Browne came east to Providence. At about this time Smith loaned Browne money for his personal needs, taking his note therefor. This fact alone would not be of much significance. Considered in connection with other facts bearing upon the relations of the parties, it is not without weight. During the summer Browne was in communication with President Allen and the other directors of the company concerning the needs of the company and means of

financing it. No disclosure was made of the purchase by Smith and Carroll of the Foster interest. Smith, Carroll, Browne, and Davol were in frequent conference. It was then arranged that Davol should buy out the McCluskey one-third undivided interest in the Jumbo claim. The purchase was completed on September 2, 1914. The negotiations for this purchase were conducted by Browne for Davol through an officer of the San Bernardino National Bank. It was understood by all four of the parties—Smith, Davol, Carroll, and Browne—that this purchase also should be kept secret from the directors and officers of the company. Davol paid for the McCluskey one-third interest $4,-700—a reduction of about $5,000 from the amount which would have accrued under the contract.

Davol at the time of his purchase knew that Smith had purchased the Foster interest through Browne.

If the defendants' counsel are correct in their claim that Davol did not at that time know of Carroll's interest in the Smith purchase, this ignorance is of no significance. Clearly, he knew of Carroll's interest shortly thereafter, and then, if not before, adopted and made his own all the acts and plans of Smith, Browne, and Carroll to get possession of the entire property of the bankrupt by fraudulent means.

Contemporaneously with this purchase by Davol of the McCluskey interest, strenuous attempts were made by Welch and other directors to raise money to pay the monthly installments, the balance of Browne's salary, for which he was pressing, and to start up the mill and otherwise develop the property of the company. A subscription paper dated September 14, 1914, was signed by most of the chief stockholders who were also holders of the debenture notes, agreeing within 30 days to pay in one cent per share on their holdings, and—what was of vital importance—that the debenture notes then outstanding in the hands of the subscribers should be extended for two years from September 15, 1914. Without such extension no plan of financing had the slightest prospect of success. Carroll was then on the board of directors acting really for Smith, Browne, Davol, and himself, and not for the corporation.

Pending the success of this enterprise for financing the company, on September 15, 1914, Smith, in Carroll's office, in behalf of himself and Davol, dictated to Carroll a letter for the purpose of having it read by Carroll at the meeting of the board of directors. In this letter Smith, for himself and Davol, offered to contribute to the new financing called for by the stockholders' committee his proportion of one cent per share on his present stockholdings, on conditions as follows:

"(1) That the whole of the money so raised shall be used for the payment only of bills now overdue at Hart, Cal., and the starting and operation of the property there. (2) That the full amount of $12,500 so raised be transmitted to F. E. Browne, at Hart, Cal., to be used for these purposes. (3) That the stock represented by the unpaid check of F. E. Shaw be transferred to the company. (4) That all the principal stockholders pay their contribution of one cent per share to this fund, regardless of whether more than $12,500 is raised or not."

The obviously intended effect of this letter was to discourage other prospective subscribers to the fund; because, Smith and Davol refusing to extend their notes, other contributors to the fund were thereby warned that Smith and Davol might use their overdue notes as a means of forcing payment out of money contributed by their cocreditors. But this scheme was really worse than it then appeared to the other directors; for Smith's conditions, if accepted, would have put the entire fund into the hands of Browne, who would have used it, first, to pay the amount claimed to be due him and to the small creditors at Hart, Cal., and, second, to improve the property which subject to his contract was then owned, not by the Fosters and McCluskeys as the other directors supposed, but by Smith, Carroll, and Davol. As Smith and Davol required the entire fund to go into Browne's possession to be used only for the payment of overdue bills and for the starting and operation of the property, payments under the Foster-McCluskey contract would be defaulted, grounding a forfeiture on thirty days' notice.

Otherwise stated: If the other creditors and stockholders in this enterprise accepted the proposition of Smith and Davol, put up through director and attorney Carroll, of raising a substantial sum of money for further development of the enterprise, Smith, Davol, Browne, and Carroll were almost certain to get the entire benefit of it. If, irritated as they naturally would be by the refusal of Smith and Davol (there is some dispute as to what Carroll's apparent and disclosed attitude was), the other parties in interest refused to raise any additional money, then the situation was ripe for Smith, Carroll, Browne, and Davol to declare a forfeiture of the Foster-McCluskey contract and for Browne to bring suit on his claim for salary, buying up also, as he did with money furnished by Smith and Davol (one or both), other small claims amounting to about $1,000. Smith and Davol also agreed to furnish Browne money necessary for his litigation expenses.

In late September, 1914, Browne returned to Hart, Cal. The success or failure of the financing plan had not then been determined. On October 1st, Smith, in Providence, writes Browne in California, stating, among other things:

"In conversation with Carroll yesterday he thought it was best for you not to put on the attachment until after we find out what they are going to do. Then there will be no fault found about the three of us, but I understood that you were to see Mr. Parsons and follow out his instructions. Of course, Carroll is not familiar with the California laws and, of course, Mr. Parsons is. Carroll is going to see Welch in regard to the payment which is in default and follow it up."

This, and much more bearing in the same direction, shows that before Browne left for California definite plans had been made to use Browne's claim, through attachment proceedings, to get early possession of the mill and other removable property, and contemporaneously declare a forfeiture of the Foster-McCluskey contract.

On October 15, 1914, Carroll writes Smith, then at Webster, Mass., a letter which we quote in full:

"Providence, R. I., October 15, 1914.

"Mr. Fred L. Smith, Webster, Mass.—My dear Fred: I received a copy of the letter which was mailed to you from your office last evening, setting forth the condition of affairs at Hart, California. Just as I was about to write you concerning this letter Mr. Welch came in and informed me that payment of $450.00 on the contract had been sent to the bank some time ago, the date not given, and that either yesterday or to-day, he had sent the second payment, which would be due to-day, taking the full limit of thirty days for payment. This consequently heals any breach of the contract, even though notice had been given under the provisions of the contract. I asked him where he got the money or rather, if the money sent to make these installment payments was money which would later be deducted from the subscription $12,500, and he said some of it was. He said that subscriptions or agreements to subscribe had reached something like $13,000.00 although some of the subscribers were not in a position to pay it all in immediately, but could pay it in three installments, and that further than that some of the large stockholders were willing to make their subscription 1½ cents per share rather than 1 cent, as originally set forth in the subscription claim itself. I told him that the subscriptions which I knew anything about were conditioned on the whole of the sum being raised and that unless it was, he could not figure in your subscription or that of Charlie, except on the express terms of your letter which I had shown to the directors.

"He has some man in two [tow] whose name I think is Holbrook, who is working with him in the raising of $10,000.00 and, as usual, is optimistic about getting the money on the debenture note proposition. I asked him if he realized that the payment of the Jumbo contract installments did not get the company out of difficulty and if he had considered the probabilities of Mr. Browne taking any action, reminding him of Browne's statement to the directors the day before he left here. He seemed to talk as if that was not a pressing and immediate trouble, but I reminded him that Mr. Browne had stated he would consult Mr. Parsons, his attorney, on his way back and if he was advised to protect himself by suit, that he would do so. Welch said while he did not think Browne would do it, that if he did so he felt sure that enough money could be raised to pay Browne, the Searchlight Company and other bills so as to prevent loss of the property.

"The fact of the Jumbo contract payments being made leaves the situation depending entirely on Browne's attachment, and if his severance of his connection with the company has not already been made known here, or his papers filed, it might be important for him to change his plan, and in any event, if he does not know that the payments have been made, he certainly should know by wire immediately. It does not seem probable that under the laws of any state that he can (get) a judgment immediately and without notice to the defendant, and when the writ is served, if the company has a resident attorney for the acceptance of service, it is his duty to send a notice of that fact to the proper officers of the company and who would be obliged to engage counsel to appear for them in the ordinary travel of the case, and to conduct the trial, if there were any to be had.

"If, therefore, the matter comes up to the board, it will be necessary to select some attorney in that section, and should he be one selected by Welch, Everson or Shaw, complications might arise immediately that would delay getting possession by execution for quite a little while.

"Naturally, I presume that Senator Carr, being a stockholder and formerly transacting some business for the company will be retained and if he has been displaced by Judge Carpenter through Mr. Browne, of course his interest will be for the company and against Mr. Browne. The latter speaks of getting judgment and execution and then negotiating the same and that is something which I do not approve of.

"In the hands of some one else who might not be bound by any agreements verbal or otherwise, to which Mr. Browne is a party, their interest might be jeopardized and I would suggest therefore, that if this claim goes to judgment and there is to be any negotiation or transfer of the judgment that it be turned over to the interests here and not to some Western third party. I

believe that Everson and others, if face to face with the payment of Browne's claim or lose their interest in the property would see that it was paid, taking notes and stock, of course, for their protection. Of course, every time they do this it increases their claim as a creditor against the company, and also increases their stockholdings which might in time give them absolute control at any stockholders' meeting to elect such a board as will do their bidding.

"I am still of the opinion that when Welch tries to gather in the subscriptions that he will fail to do so, as without the subscriptions that you control he will be unable to get the requisite amount. I went over the matter of the Davol transaction with him and he still insists that he stands by the letter sent to with reference to the delivery of this stock and that Davol's failure to notify him at the expiration of four months releases this stock from the escrow. I told him if he persisted in this course and antagonized Mr. Davol that if anything happened to his holdings, or to the stock in this company he could charge it to this attempt to grab stock which did not belong to him. Of course, he repudiates the grab part of it, claiming it belongs to him, but I thought it was best to let him know that if he had any run in with Mr. Davol later that he himself would be to blame for tumbling the house of cards upon himself.

"One thing is very certain and that is Browne's attachment if brought to the point of the directors engaging counsel, will probably disclose the fact of the transfer of the Foster interest, but inasmuch as you will probably be here before any writ can be sent from California here I can go over that phase of the matter with you more at length and in detail.

"This is all I have time to write you tonight concerning this matter.

"Yours truly,　　　　　　　　　　　　　　　　Thomas A. Carroll."

This letter, apart from the abundant other evidence, compels to the conclusion that Smith, Davol, Carroll, and Browne were then in concert planning to take from the creditors and stockholders of this company all its assets, by declaring a forfeiture under the Foster and McCluskey contract and through the use of Browne's attachment proceedings based upon his claim for salary and the assignment of the Searchlight Company claim for $665.05 and the Adams claim for $290.50. Carroll, then attorney and director of the company, was also secretly advising the other conspirators as to how a speedy judgment and execution could be obtained in order to get without delay and effectually full title to all the assets of the bankrupt.

To their surprise and disappointment, the directors succeeded in raising money enough to make payments under the contract.

On October 20th, Smith telegraphed Browne that payments on the contract had been made, and that the directors were not aware of Browne's resignation or of any contemplated suit against the company. Meantime, Browne, in California, had arranged with the sheriff to attach the mill and other attachable property. Having completed his attachment, on October 21, 1914, he telegraphed President Allen that he had "terminated his services with the company on October 1st," that the Searchlight Company and the Allen Company had assigned their claims to him, and that he had attached all the personal property for $5,006. "Sheriff took possession to-day. You had better have Attorney Carr enter appearance in your behalf and save expense to company."

Browne testified that he sent this telegram on October 21st, saying that he had withdrawn as manager on October 1st, and:

"I didn't care about advising them of my plans, but I engaged the sheriff up there to attach the property. The day he arrived there I told them."

In order to keep up the pretense of being a bona fide creditor enforcing long-postponed rights, on November 2, 1914, Browne sent the directors of the company a circular letter stating that he had terminated his services on October 1st and been forced to institute an attachment in order to secure the unpaid account of the Searchlight Company, George Adams, and himself.

Further light is thrown upon the relations of the parties to each other and to the corporation of which they were all creditors and of which Carroll was director and attorney and Browne general manager, by the admitted fact that about the middle of September, 1914, while Browne was in Providence, an agreement was made that Smith and Davol should pay Browne approximately ten per cent. of the profits they should make out of the Foster-McCluskey purchase after getting back the sums paid the Fosters and McCluskeys for those interests. Probably the actual agreement was made long before. But the date is immaterial; for counsel admits the agreement to have been made for dividing up the bankrupt's property while Browne was still manager and Carroll director and attorney. It thus related back to the beginning of the scheme. This arrangement was put in definite, written form in the spring or summer of 1915, after Carroll's death.

After Browne's attachment there was much urgency on his part for judgment by default so that he could get immediate possession of the property. On November 19, 1914, he urged upon President Allen the uselessness of an inventory by the sheriff, "for," as he says, "unless the Big Chief Company settles my attachment suit the property will all be mine and, speaking for myself, it will be unnecessary for me to have the inventory."

Meantime, on October 26th, at a meeting of the board of directors, Carroll, who was secretly advising Browne as to his attachment was, as attorney of the company, "instructed to communicate with Carr (the California attorney) so that the interests of the company should be protected in any proceedings instituted by Browne."

On November 24, 1914, Smith, in Providence, writes Browne, in California, saying, inter alia:

"I saw Charley (Davol) yesterday at luncheon and he wanted to know about the payments. He, of course, is anxious to have something doing, and, of course, understands as long as the payments are met we cannot do anything as far as he and I are concerned. At the same time, I want to see Tom (Carroll) in regard to having Hooker send a telegram to the company giving them the thirty days notice and I can see no reason why these matters should be delayed. As soon as I see him I will write you in regard to what he has to say in reference to your matters."

On November 15, 1914, Browne, at Hart, writes Smith, at Providence, of the difficulties he is having in getting immediate judgment because of the fact that he (Browne) is statutory agent and cannot acknowledge service when he is party plaintiff. That he "did not think that Mr. Carroll would adopt the stalling tactics now being pursued by Attorney Carr of Los Angeles. * * * I am curious to know if Welch and Allen know that Charlie and you own the Jumbo group. If they do know it and do not approach Charlie and you and tell you that they are favorable to a reorganization, with an assess-

ment on the stock, I will be forced to conclude that they are not in their right minds."

On December 7, 1914, Smith, in Providence, acknowledges this letter. He refers to his intention to get a conveyance from Fay of the Foster interest, which Fay was still holding; that he has just come from Carroll's office and showed him (Carroll) Browne's letter of the 15th; that Carroll stated that, when the Browne matter was brought to the attention of the board of directors, he was instructed to communicate with Carr, an attorney in Los Angeles, and that he stated to Carr that "your claim was entirely just and should be paid. * * * You will see, therefore, that there is no stalling tactics being pursued so far as Mr. Carroll is concerned in this case, and, as he says, he did not select Carr as the attorney for the company nor has he advised him what procedure to adopt at that end. He further stated that if it was his case he would go ahead and get service, if not through the appearance of the local counsel, in whatever other method is prescribed by law in that State, and that is my advice to you." After further discussion as to the best method of getting immediate judgment on Browne's claim, Smith adds:

"I am asking Carroll to resign from the board of directors at the next meeting and, of course, after he has resigned, he then will be able to take up outside affairs, such as mine and others as individuals, but you must appreciate the position he has held as a director and also attorney for the company.

"I hope that you will soon be settled in Los Angeles and that things again will be going along nicely with you, but Charlie and I will have to wait until things come to a head whereby we can get possession, that is, if the payments are not made as, of course, if the payments are made we do not expect anything to happen."

There is much more in the voluminous correspondence which passed between the parties during the winter of 1914 and 1915, showing that the four were acting in constant concert in their plans to get title to the mining property and the mill thereon, using Browne's claim for salary and Carroll's influence as attorney and director as part of the means relied upon.

On January 12, 1915, Smith in Providence writes Browne in Los Angeles, saying, inter alia:

"Do not think that Davol's and my transactions have come before the bunch here as Everson was in to see Tom (Carroll) a few days ago and he is thoroughly disgusted and discouraged with the management that has been in existence for the last six months and wants to withdraw and organize a new company. I thought best to wait until after the payments were made and let the thing take its natural course. If they are default (sic) in paying, then we get possession. At the same time, of course, your hold on the property fixes you. Thought possibly that might be a good way to get a bad matter straightened out by co-operation.

"Saw Charley (Davol) last night and he always asks if I have heard anything from you. He is anxious to do something as soon as we are in power to do it. Do not get discouraged because we are not as, of course, we have to let things take their course. You will certainly hear from me just as soon as there is anything doing."

On January 18, 1915, Browne, in Los Angeles, writes Smith a long letter, in which he states that he has confidence in the property and "know we will all profit by the enterprise." He also states:

"In connection with the Big Chief Co.'s affairs, I am keeping a few cards up my sleeve that I have not played yet. Until I know exactly how my account is going to be treated, I am going to keep enough power in my hands to ruin them in case they try any funny business. Among other things, I have the water situation in the palm of my hand, and you may rest assured I am going to keep it there. I feel that I have enough unsettled business in my hands to cause the company more expense than twice the amount of the attachment."

There is other discussion in the correspondence relative to using the water situation for the purpose of destroying the company's property interests.

In February, 1915, Holbrook, present counsel for the company, was employed by some of the directors and stockholders to visit Hart and report upon the property. Under date of February 20, 1915, Browne writes Carroll a long letter, saying inter alia:

"The afternoon of the 4th inst. I told Mr. Holbrook that Smith and Davol were the owners of the Jumbo group. As an investigator, he did not ascertain this fact, as I volunteered this information. I knew, however, that it was only a matter of a short time until his attention would be called to it through the attachment notice on the mill. * * *

"He is highly indignant at the Smith deal, and stated to me that he was going to force you to resign from the board of directors, and expose you in such a way that you would be eliminated in future matters pertaining to the Big Chief. I stated that as far as I knew, you were ignorant of the Smith deal, as Judge Carpenter drew all the papers. Holbrook immediately connected Fay with Smith, and says he will institute a suit immediately compelling Smith to sell to the company his interest in the option for the consideration he paid. * * *

"It is not necessary for a man of my limited knowledge to give you advice in legal matters, but it impresses me that if Holbrook intends to take an antagonistic stand, against Mr. Smith and Mr. Davol, that it would be highly advisable for those men and yourself to delay any legal action until the notes held by the above parties fall due, assign them to me with instructions to place another attachment upon all of the property. I informed Mr. Holbrook that it would not be advisable to take an antagonistic stand against the above men, as they were keen smart business men, with the best legal advice, and with sufficient resources to fight any case that Holbrook cared to institute."

Browne's statement to Holbrook that Carroll was ignorant of the Smith deal was, of course, entirely false, for the arrangement with Smith for the purchase of the Foster interest was advised by Carroll.

Browne adds a postscript as follows:

"I neglected to say in my letter that Mr. Holbrook endeavored in every way possible to ascertain the amount paid by Fred Smith for the Foster interest, and Charles Davol for the McCluskey interest. I carefully guarded this piece of information and he therefore returns east with no knowledge of it.

"It is possible they could get this information from Geo. Foster, and if you think it advisable, I will write and ask him to consider the transaction absolutely confidential and to divulge no information. Naturally, Col. Goff will be the man who will get the information for Shaw & Everson."

This letter, it should be borne in mind, was written by the man who had been the chief reliance of the creditors and stockholders in this mining enterprise, to another man who was at that time a director and attorney of the company they were both seeking to ruin.

On the same date Browne writes to Smith in Providence:

"My dear Fred: Your letter of the 13th inst. came to hand yesterday; I could not reply immediately, as I was busy with Mr. Holbrook and getting some advance knowledge to Mr. Carroll.

"Mr. Holbrook has expressed himself very forcibly regarding Mr. Carroll, Mr. Davol and yourself. Just before he took the train, he said to me: 'I will read Tom Carroll out of that Board of Directors, and make him ashamed to show his face. I will make Fred Smith turn the ⅔ interest over to the company for just what he paid.' Unfortunately, he does not know what you paid. That is where his case is weak. He undoubtedly could ascertain by getting into communication with Geo. Foster, but I am absolutely sure there is no man who will get that information out of Mack Foster or Lee Foster if I ask them to keep it confidential. I treated Mack and Lee Foster the way men of that type like to be treated, and I know they will stand by me through thick and thin. * * *

"I note what you say about Charlie wanting to start something, and from all appearances it will be started within a short time, when Holbrook starts to get your ⅔ interest at a bargain. I am sending Tom Carroll a telegram as per inclosed copy, in order that nothing will come as a surprise. * * *

"There is absolutely no question about the attachment being good, and there is only one way the Big Chief Co. can save themselves from losing the property, and that is by paying up. It was a terrible shock to Holbrook to learn that you and Charlie held the property and that I was about to take the improvements. Naturally, he was mad and chagrined and for that reason, I expect he will send some very unfavorable reports abroad broadcast about yours truly. I told him plainly that if he did not think the property was sufficiently good to continue the payments under the option, he should advise his clients to quit paying, and that it would be all right if he advised them to continue paying. In other words, I have the improvements corralled and whichever way he reports, it cannot hurt me, and in not hurting me, it will not hurt you or Charlie, as if we get possession of the property, we will certainly make some money.

"Since starting my suit, I have never written a word about a settlement, and it was this silence that made them send Holbrook, he of course assumes that you and Charlie were back of me. I told him I had plenty of money to fight to the last trench, but, I did not tell him from what source I would get the assistance."

On March 1st Browne in Los Angeles writes Smith in Providence, inter alia:

"You have always told me that it was due to my personality and representations that you invested in the Big Chief property: I can plainly see that Holbrook is going to return to Providence and place me in a bad light, owing to my not having told the company about the Fay-Davol deal: · I think I can truthfully say that in his investigation this is the only thing he might in any way construe as being irregular: after hearing a clear statement of facts, Heney & Carr, the attorneys for the Big Chief here, stated in the presence of Mr. Holbrook and myself, that I was fully justified in making the deal for you and Charlie.

"This piece of information was most humiliating to Mr. Holbrook, and it naturally aroused an antagonistic feeling toward me: He is undoubtedly going to try to have me ousted from the position of manager: I do not care to be relieved of the position in that way, as the proposition is now standing upon the threshold of success, and if it should fall to the lot of another man to bring it to a successful issue, he will receive the credit therefor, and the failure will be charged to me. Therefore, before you agree to renew any notes, or to take any stand whatsoever in the affairs of the company, I wish that you and Charlie, Mr. Carroll and the Sternes brothers would insist that there be no change and that I be permitted to carry out the plans I have formulated. In case you find that Everson, Shaw, Welch and Allen have too much power against you, then I wish you would wait until your notes fall due, assign them to me and place another attachment upon the property. * * *

"I am counting on you and Tom Carroll to see that justice is extended, as I would not like to be robbed of the credit of making a producing mine out of the Big Chief.

"I am sending Mr. Carroll a copy of this letter in this mail."

Browne's statement of his unwillingness to be "ousted from the position of general manager" is a curious and unconscious demonstration that he regarded his resignation of that position in the previous October as nothing but an empty form, a movement in the game that he and the other conspirators were playing in order to get for themselves the property of the company.

On March 23, 1915, Smith in Providence writes Browne in Los Angeles, stating that he has received his letters and would have called on Carroll and read them to him except for Carroll's court appointments. "He and I had a heart to heart talk last Friday morning." That Carroll was going to resign from the board of directors. After referring to various plans made to raise money to save the property by other directors, Smith says:

"I imagine that they will try every hook and turn to get the better of Charlie and I if they get half a chance and I do not think that it is Tom's intention that they will get a chance and the matter will be taken up as soon as he gets over his rush. Up to the present time they owe us three payments."

Although Holbrook, in his investigation, discovered that Smith and Davol had purchased the Foster-McCluskey interests, he did not succeed in finding out the amount paid, nor was this disclosed until the examination in bankruptcy.

After some further delay, judgment was finally entered on Browne's attachment suit on April 15, 1915, for $5,407.75. But, after the adjudication in bankruptcy this judgment was, on November 4, 1915, vacated in order to permit the bankrupt to set up in defense substantially the claims of bad faith and fraud on Browne's part referred to in this suit.

After Browne got his judgment and execution and was prepared to sell the mill and other removable property, he and his coconspirators became fearful that the Belmont, another mining company in the neighborhood, would bid above the amount of his execution and thus thwart the scheme to get title to the property, which of course they preferred rather than payment of the alleged debt upon which his execution was based. Consequently, a plan was devised for Smith and Davol to make an additional attachment of the mill as well as of the other mining claims not covered by the Foster-McCluskey contract, in order to get title to all the bankrupt's property for the prospective reorganization. Browne writes Smith on April 29, 1915, that if this Belmont Company should outbid him "the personal property would be all lost to the Big Chief, and it would upset our plans regarding a reorganization as the improvements would be gone."

"Do not lose any time in getting the notice in the hands of the Big Chief as the Belmont will buy some of the property north of the Oro Belle group and if the company again get in funds, you will have the same old crowd in control, that is Welch, Allen, Shaw, etc., and in the course of a few months everything will be back in the same condition as at present."

Steps were accordingly taken in behalf of Smith and Davol to attach and get a preference over other creditors. Smith writes Browne on May 8, 1915, inter alia:

"Of course, you know all the note holders except Davol and myself gave another year or two extension, so all the notes that will come due for the next year or so are Charlie's and mine, so Mr. Lyman in his letter to you suggested that you talk over with Judge Carpenter and see what his idea was in regard to putting them on top of your attachment. Also Seusmann, Tom Carroll's assistant, was talking of putting in a bill for Tom's services on top of our notes."

A little later Browne wrote that—

The property he had under attachment was "worth about $25,000, and in case it should be sold it would be a great loss to the parties who might eventually come in possession of the claims mentioned in the contract of May, 1910. The Tonopah-Belmont, one of the largest and most influential mining companies in the United States, have taken an option on the property to the north of the group mentioned in the contract and in case all this property is offered for sale for about $5,500 they will undoubtedly outbid me at the forced sale. This would be disastrous to the interests of Smith and Davol and for that reason I am withholding action."

Smith, Browne, and Davol continued to keep secret the amount that had been paid for Foster-McCluskey interests, indicating their belief that the other creditors and stockholders would not go to the extent of a law-suit, putting them on the stand in order to obtain disclosure of this fact.

Payments under the Foster-McCluskey contract ceased as of January, 1915. After Welch and the other directors who had been active in attempting to finance the company ascertained that Smith and Davol owned the Foster-McCluskey interests, no further payments were made. Smith and Davol thereupon, upon April 28, 1915, and again on May 19th, gave notice, claiming forfeiture under the contract. An arrangement was also made between Smith, Davol, and Browne by which Smith and Davol should pay Browne in installments the amount of his judgment for $5,407.75 against the company in the proportion of two for Smith to one for Davol. The full amount has been paid, so that Smith and Davol own the Browne claim and all rights, if any, accruing under the attachment which was much more than four months old at the time of the bankruptcy adjudication.

In June, 1915, definite written agreements were made by Browne with Smith and Davol for Browne's services in helping Smith and Davol to buy in the Foster-McCluskey interests and in getting what the parties supposed was a title to the balance of the bankrupt's property. For these services Smith agreed to hold for Browne 8.79 per cent. of his two-thirds interest in the Jumbo claims and property, and Davol agreed to hold 6.03 per cent. of his interest in the property. Otherwise stated, Smith and Davol agreed to pay Browne the full amount of his claim for salary, including the amount that had been paid for the Searchlight and Adams claims, and to hold for his benefit about 8 per cent. of the property which they proposed to reorganize and operate. The fair inference also is that Browne expected to be salaried manager for the contemplated reorganized company.

The bankruptcy of the defendant and this suit have so far prevented the fruition of this plan of getting possession of the entire assets of this mining company. As already indicated, it was not until examination in bankruptcy that many of the facts above stated became

known to the parties in interest. This suit was seasonably brought on May 15, 1916.

Carroll's executrix was made a party defendant, but, as the claim against her testator was not filed in the probate court within the time prescribed by the statutes for filing claims against the estates of deceased persons, counsel agreed upon a decree dismissing the bill as against the executrix, subject to the conditions that if a decree should be made as against Smith for a transfer of the Foster interests, the executrix should join with Smith in such conveyance and transfer on the same terms and conditions (except as to damages) as the said Smith might be required to make in such transfer; and also that the executrix should be enjoined from asserting against Smith a right to conveyance or transfer of any portion of the Foster interests. It was further provided that, if money or assets shall be paid to Smith as a condition of making such conveyance, the executrix should be entitled to an accounting from Smith for $15/55$ of such money or assets.

As Browne was not served, obviously no relief can be decreed against him in this suit. But the action sounds in tort; nonjoinder is of no avail to Smith and Davol. They are jointly and severally liable for damages and they hold the title to the Jumbo claims.

The gist of this case is that these four men fraudulently conspired to get title to a mining property which, whatever its real and ultimate value, must, for present purposes, be considered a valuable property. However risky the enterprise, it was one into which the stockholders and creditors had put about $140,000; it was by the defendants considered sufficiently valuable so that they were ready to risk substantial additional money and to resort to most extraordinary tactics in order to get title thereto. Even as late as September 3, 1915, after the adjudication in bankruptcy, Browne writes his own counsel as follows:

"You will undoubtedly recall that my reason for attaching the Fairview group and Oro Belle No. 2 was for the purpose of making a sale of the former property to the Tonopah Belmont, who were then operating the Oro Belle mine.

"The manager of the Tonopah Belmont approached me about a sale of the Fairview group, and if my plans had been perfected, we would have sold this property to the Belmont and Smith & Davol would have been reimbursed for the amount of the Big Chief notes. My plans were frustrated by the Tonopah Belmont surrendering their option on the Oro Belle, and by the Big Chief taking advantage of the bankruptcy act.

"While I consider the value of the Fairview group as entirely speculative, I did not intend to enter into negotiations with the Belmont Company for a consideration less than $15,000. We must rely, however, upon making a sale of this ground to the parties who will eventually control the Oro Belle property.

"The Oro Belle No. 2 claim, the other property owned by the Big Chief, has the southerly extension of the Oro Belle vein, and the northerly extension of the Jumbo. While the surface indications of this claim are not very extensive, the underground workings of both the Oro Belle and the Jumbo indicate the vein to pass through the entire length of the Oro Belle No. 2 claim, or 1,500 feet. I would consider this claim worth $10,000 to either the Oro Belle Co. or the Jumbo, but for a private individual to purchase the claim, its value would be problematical, as it would require extensive work to demonstrate its true worth.

"In my lettergram, I placed the value of the buildings, mine machinery and accessories, including mill, at about $22,000: I truthfully think they are-

worth nearer $25,000. These improvements are worth this sum to the parties who own the Jumbo group, as it will cost that sum to duplicate them."

The defendants certainly are in no position to contend that these properties would not have been of great value to the creditors and stockholders of the corporation now bankrupt. Whether, if the fraud had succeeded, the defendants would have profited or lost thereby, is immaterial. We cannot know that if the defendants had not been guilty of this fraud, this mining enterprise would not, before this, have been of great value, showing large profits to all of its stockholders.

It is too plain for argument that if Browne had disclosed to the directors of his corporation that the Foster-McCluskey interests were for sale at a large discount from the amount accruing under the outstanding contracts, so that the company could, instead of proceeding on a mere contingency, for a comparatively small sum have had a legal title to these mining claims, the whole problem of financing the enterprise, either to success or failure, would have been radically changed. For $10,200 instead of $32,000, this underlying title was actually secured by Smith, Carroll, and Davol. On the property there was then a mill. Apparently nothing then remained to be done to test the actual value of the mine except to furnish a reasonable amount of working capital to operate the mill. Possibly some additional expenditure, not large, was necessary for a water supply.

The evidence plainly warrants the finding that in the summer or early fall of 1914 the other parties in interest were ready to do their part in raising the full amount of money stated by Browne as necessary to put the property upon a paying basis.

In July, 1914, Browne wrote President Allen, stating, inter alia:

"I estimate that it will require about $15,000 to place the property upon a proper basis and in such condition that large profits can be secured."

This estimate of $15,000 covers continuing monthly payments of $450 each, under the Foster-McCluskey contract. It went upon the assumption that the corporation was entitled to no advantage by reason of the secret purchase of the Foster two-thirds interest by Smith and Carroll and the contemplated purchase of the McCluskey interest for which Browne was then secretly negotiating and which was conveyed to Davol on September 2, 1914. Certainly the defendants, whose agent and coadjutor Browne really was, cannot now be heard to say that, except for their fraud, the other parties in interest would not have raised the full amount stated by Browne as necessary for the success of the enterprise, or that if the money had been raised such success would not have been obtained. It would be monstrous to permit them to plead their own fraud, which brought the corporation to bankruptcy, as an excuse for the company's failure to make payments to them under the Foster-McCluskey contract.

The facts are, as already sufficiently indicated, that from at least as early as September or October, 1913, when Browne, the general manager of the company, entered into secret dealings with Smith and Carroll for the purpose of getting for the three title to the property of

the corporation of which they were the fiduciaries, that no one of the three ever acted in good faith towards the corporation; that when, in 1914, Davol joined the schemers, he became privy to the entire plan including what had gone before; that the four were then definitely and persistently planning to prevent the raising of the requisite new capital, in order to ground a forfeiture and to get for themselves the property of the crippled enterprise; that in this scheme they used wrongfully his (Browne's) position as general manager, Smith's position as director, Carroll's position as attorney, and, later, Carroll's position both as director and attorney; that Browne's groundless claim for salary, forfeited when he broke his contract for faithful services to his corporation, was used by all four conspirators as an intended means of getting title to the mill and other removable property.

[3] We cannot accept the view of the District Court that Browne's salary claim was a "just debt long overdue" against which "no grounds of defense are alleged or proved," and "there is no doubt that the defendant Browne was fully justified in bringing suit against the company and attaching its personal property, and that this was entirely consistent with good faith."

Browne's action to recover as agent and general manager for services rendered is subject to the elementary rule that he must have exercised the utmost good faith in his dealings with his principal.

Compare Little v. Phipps, 208 Mass. 331, 333, 94 N. E. 260, 34 L. R. A. (N. S.) 1046; Quinn v. Burton, 195 Mass. 277, 81 N. E. 257; Parker v. McKenna, L. R. 10 Ch. 96, 118; Wadsworth v. Adams, 138 U. S. 380, 11 Sup. Ct. 303, 34 L. Ed. 984; Murray v. Beard, 102 N. Y. 505, 7 N. E. 553.

As stated by the Massachusetts court in 208 Mass. 333, 94 N. E. 261 (34 L. R. A. [N. S.] 1046):

"If the agent does not conduct himself with entire fidelity towards his principal, but is guilty of taking a secret profit or commission in regard to the matter in which he is employed, he loses his right to compensation on the ground that he has taken a position wholly inconsistent with that of agent for his employer, and which gives his employer, upon discovering it, the right to treat him so far as compensation, at least, is concerned, as if no agency had existed. This may operate to give to the principal the benefit of valuable services rendered by the agent, but the agent has only himself to blame for that result."

The same doctrine is stated in Quinn v. Burton, 195 Mass. 277, 279, 81 N. E. 257, as follows:

"It is a principle universally recognized, as founded not only on common business morality but on a sound public policy, that persons who act in a representative capacity, whether styled executors, administrators, trustees, or agents, are not permitted in the performance of their duties to put themselves in a position antagonistic to the interests of those whom they represent. Oberlin College v. Fowler, 10 Allen [Mass.] 545; Hayes v. Hall, 188 Mass. 510, 511 [74 N. E. 935], and cases cited; Staats v. Bergen, 2 C. E. Green [17 N. J. Eq.] 554, 558; Union Stock Yards Bank v. Gillespie, 137 U. S. 411, 423 [11 Sup. Ct. 118, 34 L. Ed. 724]; Ex parte Lacy, 6 Ves. 625. If, in fact, their principal suffers no harm, or may have been benefited, this inquiry is unimportant, as the object of the law is to secure fidelity in the discharge of fiduciary duties, uninfluenced by considerations which necessarily are corrupt in their tenden-

cies. Harrington v. Victoria Graving Dock Co., 3 Q. B. D. 549. An agent who places himself in this situation creates the opportunity, and is exposed to the temptation, of taking advantage of his principal. In attempting to serve two masters, the presumption is that he will act for his own mercenary interests, and by assuming a double relation, he becomes disqualified to perform faithfully the services for which he was originally employed, and his conduct is fraudulent. New York Central Ins. Co. v. National Protection Ins. Co., 14 N. Y. 80, 91; Reed v. Norris, 2 Myl. & C. 361."

Browne rendered no faithful services to his employer from the time when, in 1913, he ceased to manage for the corporation and began maneuvering to get the property away from his employer for the benefit of himself and his coconspirators. Not only could he maintain no action for services rendered as manager during that period, but the corporation had a plain right of action against him for breach of contract. He not only abandoned the service of the corporation, but he left the corporation in ignorance of that abandonment. What damages, if any, the company may be able to show as a result of that breach of contract, it is not for us now on this record to consider. But we hold that no part of Browne's claim for salary accruing atter the date of the beginning of his wrongdoing was, either in his hands or in the hands of Smith and Davol as assignees thereof, valid and enforceable for any purpose whatsoever. Of course any damage suffered by the use of this groundless claim in the attachment proceedings is a proper subject of evidence and assessment.

[4] While what has been said may cover the point, it is well to make it clear that we cannot assent to the doctrine of the District Court that—

"Until Smith and Davol got their money back they were entitled to protect themselves by secrecy, and permit payments to be made in regular course to the bank which held the deeds in escrow. Until this time there could arise no equity in the company to have the benefit of any contract which Smith and Davol had made, assuming that their contract was better than that originally made by the company, and assuming also that it was inequitable for them to buy on better terms than the company had assented to."

We think this was error. Liability for fraud by a fiduciary does not turn upon the question as whether the recreant fiduciary has or has not at the moment derived a profit from his fraud. No corporation can be safe if its directors and other fiduciaries are to be held guilty of no breach of trust unless and until the wrongdoing produces profits to the wrongdoers.

The result is that the decree below must be reversed, and, in accordance with the understanding on which the trial proceeded in the District Court, the case is to stand for further hearing upon the damages suffered by the bankrupt corporation from the defendants' wrongdoing, and upon the terms and conditions upon which conveyance should be ordered of the properties covered by the Foster and McCluskey contract. The case is not now ripe for this court to lay down in detail rules as to damages. We do, however, make it clear that we hold broadly that the plaintiffs' charge that the defendants entered into a fraudulent conspiracy to wreck this corporation, in

order that the four wrongdoers might acquire for themselves all the assets thereof, has been sustained.

The decree of the District Court is reversed, and the case is remanded to that court for further proceedings not inconsistent with this opinion, and the appellant recovers his costs of appeal.