THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v. JAMES J. DONOVAN, DANIEL J. SWEENEY AND COR-
NELIUS J. O'NEILL, DEFENDANTS-PROSECUTORS.

Argued December 8, 1942—Decided February 8, 1943.

Before Justices CASE, DONGES and COLIE.

For the state (also for Joseph C. McNally, William E. Bradford and Bernard A. Gannon), *Daniel O'Regan,* Prosecutor of the Pleas of the County of Hudson, and *Frank G. Schlosser,* Assistant Prosecutor.

For the defendants-prosecutors, *John Warren* and *Bernard A. Green* (*Maurice A. Cohen,* of counsel for the defendant-prosecutor Cornelius J. O'Neill).

For Adolph A. Langer, *Julius Lichtenstein.*

For Frederick J. Gainsway and J. Albert Dear, *Robert Carey* and *Harry Lane.*

For John Mitchell, *Platoff & Platoff* (*John N. Platoff*).

*Amicus curiæ, Alexander M. MacLeod* (representing the New Jersey Press Association).

For Thomas H. Brown, Lewis B. Eastmead and Alexander F. Ormsby, *George T. Vickers.*

For Mary Parisi and Maurice M. Krivit, *Maurice M. Krivit.*

For William P. Heffron and Frank Farley, *Thomas J. Armstrong.*

The opinion of the court was delivered by

CASE, J. We have before us a series of motions arising out of the taking of depositions before Supreme Court Commissioner Drewen under the writ of *certiorari, In re Donovan,* 129 *N. J. L.* 25, by which the indictment found by the Hudson County grand jury charging James J. Donovan, Mayor and Director of Public Safety, Daniel J. Sweeney, Deputy Director of Public Safety, and Cornelius J. O'Neill, chief of police, all of the City of Bayonne, with non-feasance in office was brought into this court. The various elements of

the immediate controversies will appear in the course of this memorandum. We labor under a handicap in that the complete transcript, which has assumed voluminous proportions, is not before us; nevertheless we believe that the facts relied upon are essentially correct as stated.

The prosecutor of the pleas of Hudson County moves (1) for an order directing the commissioner to turn over to him certain exhibits now in the commissioner's possession alleged to have been stolen from the *Jersey Journal,* a newspaper published at Jersey City; (2) for an order vacating and quashing the taking of testimony *de bene esse* of certain witnesses in the State of New York; (3) for an order fixing a time for the conclusion of the taking of depositions and (4) for an order quashing a subpœna *duces tecum* served upon the prosecutor of the pleas.

In support of their contention that the finding of the indictment was a progressive step in a planned campaign originating and furthered outside of the prosecuting channels the indictees introduced in evidence several statements which constituted the newspaper copy upon which publication was had in the *Jersey Journal* and which are, in general, the statements referred to *infra* in the discussion of the testimony of Mr. Gainsway. The publishers of the *Jersey Journal* caused a John Doe complaint to be issued charging the theft of those statements from their newspaper offices, and it is upon that basis that the prosecutor asks that the physical custody of the exhibits be turned over to him. It does not appear that the typewritten statements have any appreciable money value; nevertheless it is proper that the prosecuting officers of the county, with the assistance of experts, should be permitted to make a physical examination for the discovery of finger prints and the like, which is the substance of the present application. It is unnecessary that the Supreme Court Commissioner should surrender physical custody of the papers to the prosecutor's office. The making of the examination which is proposed to be made can be done in the presence of the Supreme Court Commissioner (the papers remaining in his custody) and in the presence of the attorney for the prosecutors of the writ whose exhibits they are. That will be the order.

Prosecutors of the writ have abandoned their purpose of taking testimony in New York *de bene esse;* and this, in effect, disposes of the motion directed thereto. In addition, we consider that no purpose useful to the case would have been served by the taking of the testimony.

The writ of *certiorari* herein was allowed in mid-September. The indications are that, particularly under the limitations herein imposed, the prosecutors have about exhausted their opportunities for obtaining relevant and material proofs. The undue postponement of criminal proceedings is unwise, and this series of hearings should, we think, be brought to a speedy conclusion. We shall not, at this time, impose a limitation by formal order, but we express our view with the expectation that counsel will conform therewith.

We determined in an earlier decision that the subpoena *duces tecum* served upon the prosecutor should be quashed.

Prosecutors of the writ move for an order directing answers to be made by Joseph C. McNally, foreman, William E. Bradford, a member, and Bernard A. Gannon, clerk, of the April, 1942, grand jury which brought in the indictment. These persons were brought in as witnesses and declined to answer some of the questions put to them. The questions, particularly those asked of McNally, were numerous. They grade from subjects material to the issue down to the argumentative, the irrelevant and the immaterial. Prosecutors have not chosen to select specific questions for argument, but place portions of the testimony before us and argue generally. Except for the instances presently to be mentioned we shall not direct answers to be made beyond those already in the record.

The immunity of grand jurors from disclosing matters occurring at a session of the grand jury is not total. Under certain circumstances and with due respect to the status of the indictment they may not only be permitted but may be compelled to testify. *State* v. *Borg,* 8 *N. J. Mis. R.* 349, affirmed by the Supreme Court *en banc* (at *p.* 705) ; *State* v. *Silverman,* 100 *N. J. L.* 249. The free and impartial administration of justice requires that the proceedings before grand juries shall, in some respects and to some extent, be kept secret: but the sanction of secrecy has limitations.

The grand jury, shortly before it returned the indictment, caused its foreman to read in open court, and to file, an unusual document to which it gave the familiar name of "presentment." The instrument carries praise, by name, to the prosecutor, his assistants, the chief of detectives and two police aides "for the fearless manner in which they are performing their duty by exterminating from the City of Bayonne notorious houses of ill fame where immoral practices are continually carried on in vile and filthy environments." The paper continues: "The testimony before us in regard to * * * [named resorts] discloses that colored and white persons intermingled for the purpose of prostitution. The stories adduced were of such a low and filthy character as almost to nauseate us. Wasserman tests, blood tests and cultures have been made of the women frequenters of these places and some of these tests already have been returned showing that certain of the habitues are syphilitics. * * * We are sure that the governing body of the City of Bayonne knew that the conditions above described existed in their city and that they permitted such conditions to flourish. * * * Eleven convictions for keeping disorderly houses, have been had in the last six months. Surely the authorities of the City of Bayonne knew that these conditions existed. Everybody in Hudson County is familiar with them. Should those responsible be permitted continually to ignore these flagrant violations? We trust not. We hope that the prosecutor will continue his drive until the officials who are responsible for such notoriously disorderly conditions shall be brought to justice." The reason for a promulgation of that sort is not apparent. The prosecutors charge that it was fanfare designed to whip up public sentiment to the point of expecting an indictment as a matter of course—a progressive step in the alleged program.

McNally was asked: "At that time [viz., when the witness read the presentment aloud in open court] was there evidence before the grand jury to justify those statements in that presentment?" The witness declined to answer upon the ground that his lips were sealed by the oath of secrecy. We give to the word "justify" the import of "support." It has

long been settled in this state that the illegality or the incompetence of evidence taken before a grand jury does not afford the subject-matter to sustain a motion to quash an indictment, *State* v. *Dayton,* 23 *N. J. L.* 49, 56; *Gibbs and Stanton* v. *State,* 45 *Id.* 379; or, as the rule was expressed in *State* v. *Ellenstein,* 121 *Id.* 304, 310, that "The question whether the evidence before a grand jury was competent or incompetent is, saving misconduct, irrelevant on a motion to quash." But we do not understand that it is within the proper function of a grand jury indifferently and openly to present charges against an individual without having some evidence to support those charges. Such a procedure would take on the aspect of misconduct and "the court may, in the exercise of a sound discretion, in order to promote the purity of the administration of justice and for the greater security of the rights of the citizen, quash an indictment by reason of the misconduct of the grand jury." *State* v. *Dayton, supra* (at *p.* 58). The prosecutors were entitled to ask, not what the details of the evidence were (*State* v. *Borg, supra,* at *p.* 351), but the simple question whether there was, in fact, evidence before the grand jury in support of the several accusations laid against them by that body. Likewise, prosecutors were entitled to learn whether a quorum of the grand jury sat in the finding of, and voted for, the "presentment" and the indictment. Those questions were, in essence although not in precisely that form, asked of the clerk. And that information should, if prosecutors press for it, be given; although we have no reason, from anything before us, to suppose that the proceedings were other than regular in the respects mentioned.

Here, and generally on the scope of the present writ, it should be remembered that we are not engaged in a probe into the practice and procedure of the Hudson County criminal authorities in and about the discovery and punishment of crime. Definite issues are being tried out under the pending writ of *certiorari.* Subpœnas directed to prospective witnesses should be correct in form and reasonable in demand, regard being had to the issues. Questions put to witnesses on the stand should not only be relevant and material to the

issues but should be framed in accordance with the rules of evidence applicable to court proceedings. Prosecutors appear frequently to have called for proofs or to have sought to evoke testimony without the assurance that such matters, when produced, would be evidential but rather in the hope that from them facts helpful to their case might perchance appear. However understandable that motive, it is not the foundation upon which evidence rulings may be based.

Prosecutors further move for an order to compel the editors of several Hudson County newspapers to answer the questions propounded to them as witnesses before the Supreme Court Commissioner. The examination of the newspaper men was of considerable length. Some of the questions were answered, some were answered in part, some were abandoned and some met with a refusal to answer upon the ground of privilege under the statute. Prosecutors do not differentiate between questions but make a blanket argument addressed to all. Our study brings us to the conclusion that the legality of the refusals to answer is in serious question with respect to only one type of question; and that that type of question, with its background, is sufficiently illustrated by the following excerpt from the testimony of Frederick J. Gainsway, managing editor of the *Jersey Journal:*

"*Q.* Are you familiar with the publication in your newspaper since December 1st, 1941, of releases for publication made or alleged to have been made by former Assemblyman John C. Sharkey, John Griffin, Harry Vanderbach, Patrick W. Flanagan, Freeholder Joseph Buckley and Daniel J. Murray? *A.* Generally, yes.

\* \* \* \* \* \* \*

"*Q.* Weren't the men who made the statements the source of the information? *A.* Exactly.

"*Q.* So there is no secret about that because that was published in your newspaper? *A.* That is right.

"*Q.* The fact that they made those particular statements? *A.* That is right.

"*Q.* So, knowing the source and having printed it in your newspaper, I now ask you by what means the source of the information, which was the individuals who sought publicity,

conveyed the releases to you or to your paper for publication? A. I decline to answer the question."

The statements were press releases given out from time to time and published in the *Jersey Journal* during the period preceding the finding of the indictment. All contained attacks upon one or more of the prosecutors.

The witness, in refusing to answer, relied upon the provisions of *R. S.* 2:97-11 (formerly chapter 167, sections 1 and 2, *Pamph. L.* 1933) as follows:

"No person engaged in, connected with or employed on any newspaper shall be compelled to disclose, in any legal proceeding or trial, before any court, before any grand jury of any county or any petit jury of any court, before the presiding officer of any tribunal or his agent, or before any committee of the legislature, or elsewhere, the source of any information procured or obtained by him and published in the newspaper on which he is engaged, connected with or employed."

We shall assume, without deciding, that the statute is constitutional, and we shall consider whether either the wording or the intent of the statute extends to such a refusal.

The general rule, where there is no statute, is thus stated in 70 *C. J., tit. "Witnesses," p.* 377, § 504:

"The rule of privileged communications does not apply to communications to a newspaper editor or reporter, for, although there is a canon of journalistic ethics forbidding the disclosure of a newspaper's source of information, it is subject to qualification and must yield when in conflict with the interests of justice. Accordingly, a witness before the grand jury on a complaint for libel published in a newspaper may be required to disclose the name of the writer, which he admits he knows, over the objection that it is an office regulation that the editors of the paper are not to give the name of the writer of articles published in it."

That statement is supported by the cases, which are well reviewed in a recent unanimous decision of the New York Court of Appeals, *People, ex rel. Mooney* v. *Sheriff of New York County,* 269 *N. Y.* 291; 199 *N. E. Rep.* 415; 102 *A. L. R.* 769.

Mr. Justice Kalisch, speaking for this court in the case

of *In re Julius Grunow,* 84 *N. J. L.* 235, said with respect to Grunow's stated reason for refusing to answer, namely, that he was a newspaper reporter and could not give up his sources of information:

"In effect he pleaded a privilege which finds no countenance in the law. Such an immunity, as claimed by the defendant, would be far reaching in its effect and detrimental to the due administration of law. To admit of any such privilege would be to shield the real transgressor and permit him to go unwhipped of justice."

Our state is one of a small group (embracing otherwise, so far as we are informed, the States of Maryland, Alabama, California, Kentucky and Pennsylvania) where the privilege has now been extended by statute to a newspaper editor or reporter. Such enactments have been severely criticized by Professor Wigmore in the third edition (1940) of his work on Evidence (section 2286, subdivision 3). They are placed by him in a category which he calls "legislative novelties." Nevertheless, the argument that the granting of the privilege is contrary to public policy falls because the privilege is statutory and was ordained by the legislature whose province it is to determine public policy. *Schenley Products Co.* v. *Franklin Stores Co.,* 124 *N. J. Eq.* 100. The critical attitude which courts and text book writers have taken serves, however, to emphasize the rule of construction that statutes in derogation of common law rights are to be strictly construed and that courts are not to infer that the legislature intended to alter the common law principles further than is clearly expressed or than the case absolutely requires. *State* v. *Packard-Bamberger & Co., Inc.,* 123 *N. J. L.* 180; *Tinsman* v. *Belvidere Delaware Railroad Co.,* 26 *Id.* 148, 167. In the instant case we have an indictment which the defendants charge was obtained by political pressure and as the result of a conspiracy, one of the overt acts being the publication of a number of interviews authorized by the public men to whom they are attributed. The statements themselves, or some of them, known as "releases," or "newspaper copy," as sent to the newspaper office, are produced.

On the postulate of the quoted testimony the sources of

the newspaper interviews are known. They are the men to whom the interviews are attributed. What is not known is: Who physically transported the statements to their named destination? It will be seen that there is here no *onus* upon the newspaper; there is no question of the surreptitious acquisition of news, or of the printing of matter that was not authorized. In fine, the inquiry goes not to the source, but to the messenger by whom the article was taken to the publication office where the author or "source" intended it should go—a fact which ordinarily would be merely a minor incident and here assumes materiality only because of an issue which does not involve the newspaper or the actual publication. The acts of communicating the "story" to the newspaper offices and of publication were the objectives of the author or "source." No reason, legitimate to the legislative intent as we understand that intent, appears why the vehicle of transmission should not be revealed.

A phase of the statute which suggests limited application is that the privilege is not made absolute in the sense that the statute forbids a newspaper editor to make answer—such a privilege, for instance, as prohibits an attorney from divulging confidential communications entrusted to him by his client—but leaves the witness free to tell or not to tell as he may choose. Thus, it depends, not upon the issue, or upon the rules of evidence, or upon the judgment of the court or other impartial arbiter, but upon the uncontrolled determination of the witness whether he will help or hinder an inquiry; and that condition is fraught with such serious consequences upon third persons that it ought not be applied unless the facts are clearly within the purview of the statute.

We conclude that the question did not go to the *source* of the publication, wherefore the statute does not, in terms, apply; and we are further of the opinion that the legislative intent did not reach to such a situation as here existed. Mr. Gainsway will answer the posed question. The other newspaper witnesses are, of course, subject to the same principle.

Prosecutors of the writ also move for an order directing Mary Parisi to answer questions which she had refused to answer and directing her attorney, Maurice Krivit, to refrain

from counseling and advising the witness not to answer. Prosecutors' reply brief expresses confidence in Mr. Krivit's high purpose and disavows any desire to impugn or punish him. The live question, then, is whether the witness should be compelled to answer. Miss Parisi had been indicted by the Hudson County grand jury on a charge of attempting to obstruct justice, had pleaded not guilty to that indictment and was awaiting trial when she was brought, by subpœna, before the Supreme Court Commissioner for examination in these proceedings. The questions which she refused to answer related either directly or indirectly to the incidents with which her indictment was concerned. We find nothing in the papers to indicate that the questions asked of her and which she did not answer were either relevant or material to the case of the prosecutors herein. Her situation was quite too delicate to permit of a probing by examining counsel on the mere hope that from her answers to questions immaterial on their face he might elicit something of value to his clients. This motion is denied.

Thomas H. Brown, Lewis B. Eastmead and Alexander F. Ormsby, judges of the Hudson County Court of Common Pleas, under subpœna to appear and testify before the Supreme Court Commissioner, move to quash and vacate the subpœnas. It is suggested that the subpœnas were served upon them while they were holding court sessions; but that appears not to be the fact. The question before us now is whether a judge of the Court of Common Pleas, who by virtue of that office is judge also of the Court of Quarter Sessions and in the latter capacity has had to do with some proceeding under an indictment, which indictment by writ of *certiorari* is taken to the Supreme Court, is privileged from giving testimony in the *certiorari* proceedings. We know of no such privilege. The cases cited in support of the affirmative contention are *State* v. *DeMaio,* 69 *N. J. L.* 590; *affirmed,* 70 *Id.* 220; *Johnson* v. *City of Wildwood,* 13 *N. J. Mis. R.* 593; *Crawford* v. *Hendee,* 95 *N. J. L.* 372; *Taylor* v. *Doremus,* 16 *Id.* 473; *State* v. *Bolitho,* 103 *Id.* 246; *affirmed,* 104 *Id.* 446; *Hale* v. *Wyatt,* 78 *N. H.* 214; 98 *Atl. Rep.* 379; *White Mountain Freezer Co.* v. *Murphy,* 78 *N. H.* 398;

101 *Atl. Rep.* 357, and *Woodward* v. *City of Waterbury (Conn.)*, 113 *Conn.* 457; 155 *Atl. Rep.* 825. None of the New Jersey citations is pertinent to the question just stated. In the cited New Hampshire case of *Hale* v. *Wyatt* the question up for decision was whether the reception of the testimony, given without objection, of a judge who had presided at an earlier stage of the proceedings was ground for setting aside the findings of the jury, and that question was decided in the negative. Whatever may be considered helpful to the prosecutors herein in the remarks *obiter* was largely neutralized in the later opinion by the same court in *White Mountain Freezer Co.* v. *Murphy* wherein it was said: "The duty rests upon every citizen to disclose, when called upon, facts within his knowledge essential to the administration of justice. Judges are not exempt from the performance of this duty, and as a class are necessarily impressed with its importance. If such privilege exists, it has been honored by breach rather than by observance." In *Woodward* v. *City of Waterbury* the Supreme Court of Errors of Connecticut said: "For obvious reasons the calling of judges of the Superior Court as witnesses should be avoided whenever it is reasonably possible to do so. Counsel should never summon them if the rights of their clients can be otherwise protected. But if summoned, they cannot refuse to testify." We conclude that the moving judges are not immune from the process served upon them and that it is their duty to respond. Nevertheless, counsel should not summon judges of the rank of those here involved if the rights of clients can be otherwise protected. Perhaps, in anticipation of the further examination of these officials, we should add that, in our opinion, they are under no obligation to divulge the reasons that motivated them to their official acts and that those acts may well be proved, in the absence of some unusual circumstance, from the court records. A judge ought not to be called upon, unnecessarily, to prove such matters. The examination should in no sense and to no degree take on the flavor of a trial of the witness. We do not perceive what information may be elicited from these gentlemen that could not better be elicited from other sources; but we are unable to state that there may not be

questions asked which shall properly call for answer. Consequently the motion is denied.

William P. Heffron and Frank Farley, respectively clerk of the Board of Chosen Freeholders and treasurer of the County of Hudson, move to quash writs of subpœnas *duces tecum* served upon them. The demands for production are broad beyond any reasonable conception of the issues. The motion is granted.

The results of the various motions are mixed. Costs are allowed against the prosecutors and in favor of William Heffron, Frank Farley and Mary Parisi; otherwise no costs are allowed.

Donges, J. (Concurring.) I concur in the opinion filed in this case, except in so far as it deals with the questions propounded to certain editors who relied upon *R. S.* 2:97-11 (formerly sections 1 and 2, chapter 167, *Pamph. L.* 1933).

I am constrained to dissent from the construction put upon the statute by the opinion filed, assuming that the statute is valid. My interpretation of the purpose and language of the statute is that a newspaper man is not compelled to disclose the means by which he obtained information published in his paper. The "source" of the newspaper man's information is the agency, person or means by which the information was communicated to him, and not the person who is said to have originated the news. As I construe it, the statute was designed to avoid disclosure of the name of the person who supplied the information, hence I cannot agree with the construction of the majority opinion.