82 N.J. Super. 269 (1964)
197 A.2d 416
WILLIAM H. BEECROFT, PLAINTIFF,
v.
POINT PLEASANT PRINTING & PUBLISHING CO., A CORPORATION OF THE STATE OF NEW JERSEY, AND VICTOR D. SHANAHAN, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided January 21, 1964.
*271 Mr. John G. Stompoly for plaintiff (Messrs. Ewart, Lomell & Muccifori, attorneys; Mr. Stompoly on the brief).
Mrs. Sonia Napolitano for defendants (Messrs. Pindar, McElroy, Connell & Foley, attorneys; Mrs. Napolitana on the brief).
KNIGHT, A.J.S.C.
This is an action for libel in which plaintiff seeks compensatory, special and punitive damages as a result of an allegedly defamatory editorial published in the July 24, 1963 issue of defendant's newspaper, The Point Pleasant Leader. The editorial, entitled "INSIST ON RIGHT TO KNOW," allegedly accuses plaintiff of performing his duties as police chief of the Borough of Point Pleasant in an unlawful, partial and dictatorial manner, without regard to the rights of the public, contrary to law and in violation of his oath of office.
The matter is before this court on defendants' motion to strike several interrogatories propounded by plaintiff which, generally speaking, ask for the facts upon which defendants presumably based their editorial opinion and the source or sources of these facts including names, addresses and positions held.[1] Defendants claim that the information sought falls within the ambit of confidential communications between *272 newspapermen and their informants, thus conferring a privilege of nondisclosure. Defendants' other objections, based largely on the ground of irrelevancy, and plaintiff's objections to the procedural form of the motion have not been argued and, accordingly, are considered as abandoned.
At common law, newspapers had no privilege to conceal from judicial inquiry either the source of their information or the information itself. State v. Donovan, 129 N.J.L. 478 (Sup. Ct. 1943); In re Julius Grunow, 84 N.J.L. 235 (Sup. Ct. 1913). However, refusals of newspapermen to divulge their sources have occasionally been upheld without express judicial recognition of a privilege. Note, "Privilege of Newspapermen to Withhold Sources of Information from the Court," 45 Yale L.J. 357 (1935). The argument most often advanced for refusing to compel disclosure is that the public is the ultimate beneficiary of the free flow of news, and that absent the right of newspapers to fully and completely protect their sources of information, the public frequently would be deprived of knowledge concerning matters which rightfully belong in the public domain. Other reasons include the professional pride and code of ethics of newspapermen which preclude divulging the names of confidential informants, and the need for complete freedom of the press, not only in publishing news, but also in gathering it and protecting its source.
Both the privilege itself and the reasons underlying it have been the subject of frequent criticism. 8 Wigmore, Evidence *273 (McNaughton ed. 1961), §§ 2285-2286, pp. 527-533; Carter, "The Journalist, His Informant and Testimonial Privilege," 35 N.Y.U.L. Rev. 1111 (1960); Morgan, "Foreward," Model Code of Evidence (1942), pp. 22-30; Notes, 35 Neb. L. Rev. 562 (1954), 36 Va. L. Rev. 61 (1950), 45 Yale L.J. 357 (1935); State v. Donovan, supra; In re Julius Grunow, supra. In general, it is said that the harm caused by divulgence is more than compensated by the benefit to be derived by the correct disposal of litigation. 8 Wigmore, op. cit., pp. 527-528. Furthermore, the observation has been made that newspapers which publish in jurisdictions where no privilege of nondisclosure is available have not suffered as a consequence. Note, 45 Yale L.J. 357 (1935); In re Taylor, 412 Pa. 32, 193 A.2d 181 (Sup. Ct. 1963) (dissenting opinion).
However, it is unnecessary for this court to pass upon the respective merits of the arguments for and against the newspaperman's privilege, in view of the fact that the New Jersey Legislature has made the initial policy determination in recognizing the newspaperman's privilege not to divulge the source of his information. The statute in question, N.J.S. 2A:84A-21, provides:
"Subject to [N.J.S. 2A:84A-29, relating to waiver], a person engaged on, connected with, or employed by, a newspaper has a privilege to refuse to disclose the source, author, means, agency or person from or through whom any information published in such newspaper was procured, obtained, supplied, furnished, or delivered."
In considering the scope of this legislative declaration, the above-mentioned policy considerations are useful as tools of construction, at least to the extent that the statute fails to clearly embrace a particular factual situation.
It is significant that in the vast majority of reported cases involving the newspaperman's privilege, it was invoked before grand jury or legislative bodies, or at similar investigating proceedings instituted as a result of an article or series of articles published in a newspaper. 8 Wigmore, op. cit., pp. 529-530, n. 9; Notes, 35 Neb. L. Rev. 562 (1954); 45 Yale L.J. *274 357 (1935). See also cases cited in Garland v. Torre, 259 F.2d 545, 550 (2 Cir. 1958), cert. denied 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231 (1958). Thus, in the typical case, the news reporter possesses information of the matter under investigation, yet refuses to disclose its source. The few reported decisions in this State illustrate similar situations. In re Julius Grunow, and State v. Donovan, supra.
With this background, it is entirely reasonable to conclude that our Legislature considered the benefit to the public welfare over the long run as outweighing the occasional benefit to be derived by compelling disclosure of newspaper sources as a necessary adjunct to investigating crime and corruption. This determination is not inconsistent with the rationale behind other, more widely recognized privileges which protect confidential communications such as those between lawyer and client (N.J.S. 2A:84A-20), priest and penitent (N.J.S. 2A:84A-23), and husband and wife (N.J.S. 2A:84A-22). In each of these cases our Legislature has declared that the rule of nondisclosure prevails even at the expense of hampering a judicial or legislative proceeding or protecting a criminal.
By contrast, however, an action against a newspaper for libel presents entirely different considerations. It has been noted that "the interest in safeguarding newspaper sources becomes less substantial in cases involving the publication of allegedly defamatory statements, since defamation is outside the area of constitutionally protected expression and the newspaper is the means whereby the material is disseminated." Note, 72 Harv. L. Rev. 768 (1959). But the limited applicability of a newspaperman's privilege to a suit for libel is even more strikingly illustrated by the case of Brogan v. Passaic Daily News, 22 N.J. 139 (1956). In that case, plaintiff, a city councilman and a candidate for re-election, brought an action based on an allegedly libelous article published in defendant's newspaper. Defendant set forth the following separate defenses:

*275 (1) The article was not a libel.
(2) It was published in good faith with reasonable belief as to its truth.
(3) A retraction was published.
(4) The statements were within the boundaries of fair comment and not motivated by actual malice.
The jury awarded plaintiff compensatory damages, but not punitive damages. Plaintiff appealed contending, inter alia, that the trial court's ruling that defendant's sources of information were statutorily privileged was erroneous and prejudiced plaintiff's claim to punitive damages. The Supreme Court agreed, holding that where a newspaper raises the defenses of fair comment and good faith, and, through its news reporter, testifies that its information came from a "reliable source," the newspaper in effect waives its privilege and it is error to refuse cross-examination concerning the "reliable source."
Here, as in Brogan, plaintiff, a public official, brings an action for compensatory and punitive damages based on an allegedly libelous article published in defendant's newspaper. Also, as in Brogan, the separate defenses of fair comment, good faith and reasonable belief as to truth have been set forth.
Thus, despite the newspaperman's statutory privilege of nondisclosure, this court finds the reasoning of our Supreme Court in Brogan to be controlling in the present case. The fact that the court in Brogan was construing the previous newspaperman's privilege statute is not a significant distinction. At that time the statute in question (N.J.S. 2A:81-10, repealed by N.J.S. 2A:84A-45) provided as follows:
"No person engaged on, connected with or employed on any newspaper shall be compelled to disclose, in any legal proceeding or trial, before any court, before any grand jury of any county or any petit jury of any court, before the presiding officer of any tribunal or his agent, or before any committee of the legislature, or elsewhere, the source of any information procured or obtained by him and published in the newspaper on which he is engaged, connected with or employed." *276 The only material change in the current statute is the word "source," which has now been expanded to include "source, author, means, agency or person." Undoubtedly, this change was designed to circumvent the decision in State v. Donovan, supra, where our former Supreme Court held that the fact a "source" of information was privileged would not prevent disclosure of the name of a messenger who brought an article of known authorship to the newspaper.
By the same token, however, the Legislature presumably (or, at least in legal contemplation) knew of the Supreme Court's decision in Brogan at the time that the present newspaperman's privilege was enacted in 1960. And yet, even by implication, the statutory language cannot be enlarged to encompass either the situation in Brogan or the present case. Thus, this court is unwilling to place upon the present statute an interpretation which neither the legislative history nor the words themselves will bear, especially in the light of nearly universal recognition that statutory privileges, being in derogation of the common-law right to obtain information on matters directly in issue, should be strictly construed. 8 Wigmore, op. cit., §§ 2285-2286; Brogan, supra, and State v. Donovan, supra.
As a further ground in support of their motion, defendants argue that since they bear the burden of proving the defenses of truth and fair comment, plaintiff will have more than adequate opportunity at trial to cross-examine defendants' witnesses and thus obtain all the information he now seeks.
This argument is untenable since defendants' witnesses at trial may or may not correspond with "the identity and location of persons having knowledge of relevant facts." Unquestionably, plaintiff is entitled to know the latter, and it is expressly permitted by R.R. 4:16-2 relating to the scope of pretrial examination.
Furthermore, defendants' argument overlooks one of the basic purposes of pretrial discovery; that is, "as a device for ascertaining the facts, or information as to the existence *277 or whereabouts of facts." Lang v. Morgan's Home Equipment Corp., 6 N.J. 333, 338 (1951), quoting from Hickman v. Taylor, 329 U.S. 495, 501, 67 S.Ct. 385, 389, 91 L.Ed. 451, 457 (1947). More specifically, divulgence of the names of persons having knowledge of relevant facts would enable plaintiff to "investigate their background in order to discover any discrediting matter which might exist." Evtush v. Hudson Bus Transp. Co., Inc., 10 N.J. Super. 45, 51 (App. Div. 1950), affirmed 7 N.J. 167 (1951).
The information which plaintiff seeks in his interrogatories is not subject to the objection that he is on a so-called "fishing expedition." See 2 Schnitzer & Wildstein, N.J. Rules Service A IV-435. In Brewster v. Boston Herald-Traveler Corp., 20 F.R.D. 416, 417 (D. Mass. 1947), it was held that the identity of a source of information in a libel suit is relevant "in that it would have some bearing and may lead to some admissible evidence on the issue of malice." And in Garland v. Torre, supra, it was stated that a question propounded to defendant at the taking of oral depositions and relating to the source of an allegedly libelous publication "went to the heart of the plaintiff's claim." 259 F.2d, at p. 550.
In view of the sweeping nature of our discovery rules, which are designed to insure, with few exceptions, the ability to obtain all relevant facts before trial, this court perceives no distinction between Brogan v. Passaic Daily News, supra, where the privilege was claimed on cross-examination at trial, and the case at bar where the privilege has been asserted before trial in support of defendants' motion. "Concealment and obstructive tactics are not tolerated in discovery matters any more than they would be at the trial itself." 2 Schnitzer & Wildstein, op. cit., A IV-462. Moreover, under similar discovery rules in the federal courts, claims of a privilege not to divulge sources of allegedly defamatory publications have been rejected at the pretrial stage. Garland v. Torre, and Brewster v. Boston Herald-Traveler Corp., supra.
*278 It is necessary to give some consideration, however, to the precise grounds for the unavailability of the newspaperman's privilege to proceedings of the type presently before the court. In Brogan the court alternatively rested its decision on the ground of inherent unfairness in permitting defendant to use the privilege as a sword rather than a shield, as was intended by the statute, and on the ground that the privilege was "waived" by defendant's witness. With reference to the former ground, the court stated:
"The position of the respondents in this case is that they insist on asserting these defenses based upon the reliability of the source of information upon which they relied, yet refuse to disclose what those sources were, so that the jury could ascertain whether they were in fact reliable." (22 N.J., at p. 152)
And with respect to the question of waiver the court added:
"The witness Smith waived his statutory privilege by testifying that he received his information from `a reliable source' and then testifying as to the information he had received. Such testimony was relevant to the basic issues of fact and law raised by the complaint and the defenses of fair comment, good faith, truth, and lack of malice." (22 N.J., at p. 154)
The present version of the newspaperman's privilege statute incorporates by reference N.J.S. 2A:84A-29, which provides that there is a waiver of the privilege when
"* * * the holder thereof has
(a) contracted with anyone not to claim the right or privilege or,
(b) without coercion and with knowledge of his right or privilege, made disclosure of any part of the privileged matter or consented to such a disclosure made by anyone."
It is not clear from the pleadings and the limited facts before the court whether a waiver within the meaning of subsection (b) above has occurred. However, it cannot be concluded from the mere fact that the Legislature has set forth only two instances of statutory waiver, that a waiver cannot occur just as effectively from other acts. A person by acts or omission may waive even a constitutional right to which he would otherwise be entitled provided that the waiver does not run *279 counter to public policy or public morale. Note, 17 Rutgers L. Rev. 218, 221 (1962).
Thus, the voluntary interjection in the present case of the defenses of fair comment, good faith, truth, and lack of malice, while conceivably not within the scope of a waiver as defined by N.J.S. 2A:84A-29(b), can nevertheless be viewed as an act constituting an effective waiver as such.
Perhaps more significant, however, are the basic concepts of fairness and justice deemed by the court in Brogan to be paramount to the policy of the newspaperman's privilege. Indeed, these considerations were elevated to a constitutional level by Justice Heher in a concurring opinion wherein he stated:
"The defendant cannot invoke the statutory privilege to render conclusive their own evaluation of the character and quality of the source. This is basic to due process. Otherwise, cross-examination relevant to a crucial issue would be denied. The statute has no such sweep. It was not designed to reach this situation." (22 N.J., at p. 156)
Thus, when plaintiff's requests for the facts which supported defendant's editorial of July 24, 1963 and the sources of said facts are considered in light of the pleadings, it becomes readily apparent that the obligation of confidence, which defendants may in good faith have undertaken, must yield to "the general liability of every person to give testimony upon all facts inquired of in a court of justice." Wigmore, op. cit., § 2285, p. 527.
This determination makes it unnecessary to consider plaintiff's contention that since the editorial in question contains opinions rather than facts, it is not "information published" within the meaning of N.J.S. 2A:84A-21, and thus the sources are not privileged. On its face, however, the contention appears to lack merit. If it be acknowledged that the Legislature when it adopted the statute had in mind the supposed benefit accruing to the public from the free flow of news, then there is little difference between fact or opinion concerning a public official whose actions are legitimately the *280 subject of comment, whether it be praise or criticism. Presumably, the public regards a newspaper editorial as an official expression concerning the propriety of governmental acts, the conduct of public officials, and other matters of public interest. Of course, where no information relating to an event or series of events is published, then it can be argued that the reasoning behind the statute falls, since there would be no free dissemination of news to the public. But if plaintiff's argument is carried to its logical limits, then the omission from publication of any "fact" from an informer's story would mean that the privilege could effectively be circumvented by demanding the source of the unpublished information. Furthermore, inasmuch as defendants concede that the editorial was based upon facts, claiming only a privilege as to the source of these facts, the "fact-opinion" distinction does not appear to be a significant one.
As a final matter, it should be mentioned that in refusing to grant defendants' motion to strike certain of plaintiff's interrogatories on the ground of privilege, the newspaperman's statute with the basic policy behind it has by no means been rendered ineffective. Clearly, the statute confers a privilege upon the newspaperman but not upon his informant, and accordingly, the privilege may be waived by the former regardless of the wishes of the latter. Brogan v. Passaic Daily News and State v. Donovan, supra. Thus, even where, as in the present case, a newspaper has been sued for libel, the choice of whether the statutory protection is to be sought is initially left to defendants. But where, as here, defendants go further than simply attempting to defend solely on the ground that the editorial was not defamatory, they cannot then set forth whatever defense is favorable to their position "and then plead the privilege to prevent any disclosure of the detrimental facts." Brogan, supra, 22 N.J., at p. 152.
Accordingly, defendants' motion to strike the interrogatories which are the subject of this motion is denied.
Counsel may submit an appropriate order in conformity with this opinion.
NOTES
[1] Typical of those interrogatories to which a privilege of nondisclosure has been asserted is the following:

"17. Referring to paragraph 5 of the Complaint where we quote from the July 24, 1963 article as follows:
`That sets up the chief of police as a "Little Caesar" and creates a police state in the community.'
(a) If by the words `Little Caesar' you meant that plaintiff exercised an uncontrolled and unauthorized powers in the community, state in detail every factual instance where plaintiff did so including names, addresses and positions of all persons from whom such information was obtained; names, addresses and positions of all persons who obtained such information for you; dates, times and places when such information was obtained; the rules, regulations, ordinances, statutes or other procedures which plaintiff violated.
(aa) If not the above, what did you mean by the words `Little Caesar'?
(b) State what you meant by the words `creates a police state in the community' and describe in detail the factual instances supporting your contention that a `police state' existed in Point Pleasant on July 24, 1963, including names, addresses and positions of all persons involved and all other sources of your information."