# DAVID M. LIGHTMAN *v.* STATE OF MARYLAND

[No. 593, September Term, 1971.]

*Decided August 4, 1972.*

The cause was argued before MURPHY, C. J., and ANDERSON and ORTH, JJ.

*Francis D. Murnaghan, Jr.,* with whom was *Douglas D. Connah, Jr.,* on the brief, for appellant.

*E. Stephen Derby, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Henry R. Lord, Deputy Attorney General,* and *John L. Sanford, Jr., State's Attorney for Worcester County,* on the brief, for appellee.

MURPHY, C. J., delivered the opinion of the Court.

Appellant, a newspaper reporter for the Baltimore Evening Sun, was summoned before the Grand Jury of Worcester County on August 9, 1971 to testify with respect to his knowledge of suspected illegal drug traffic in Ocean City, Maryland. Earlier, on July 26, 1971, appellant had published an article in The Evening Sun under his byline which was entitled "Ocean City: Where the Drugs Are?"; it was the product of a special assignment given him by his editors to investigate the activities of young people at Ocean City, particularly those relating to the use and selling of drugs.[1] The article described an incident occurring in a pipe shop located near the lower end of the Boardwalk. It read, in part:

> "A shop near the lower end of the Boardwalk wants to be sure its customers are satisfied with the pipes they buy. So salesmen sometimes let them draw some marijuana before they make a purchase.
> "The shop has pipes for all purposes—combination pipes, with bowls for opium, tea and hash; adjustable pipes for smoking pot with

---

1. Two other articles were published in The Evening Sun as a result of appellant's assignment: (1) "Teens Play at Panhandling," published on July 20, 1971, and (2) "New Religions Appear on Boardwalk," published on July 26, 1971.

and without water; buckle pipes, which clip on to one's belt buckle (and are thus easily camouflaged), and others.

"Last Friday night, a uniformed Ocean City policeman was standing in another part of the shop. The shopkeeper, her legs stretched out on a water bed in the next room, tried to explain uses of the various pipes to a customer.

"The shopkeeper asked him if he would like to 'draw some grass.' He pointed to the officer.

" 'Don't worry about him. We have a lot of cops come in. You know, it's rough for them, most are under 21. We're nice to 'em, so they don't come sniffing around.' The customer declined the offer.

"Wherever young, long-haired, freaky-looking people are gathering, policemen seem to be watching them in Ocean City. The police are usually about the same age as the hangers-on.

\* \* \*

"The woman in the pipe store for example is 22. 'I don't think grass will hurt you, so I sell this head stuff. And I smoke cigarettes because I figure they hurt you until you're older.

" 'But these other drugs just aren't worth it. After you've turned on to acid or coke a few times, you realize how temporary it is.'

"She says she does not use any drugs herself."

The Grand Jury asked appellant, based on his personal observation, to state the location of the pipe shop referred to in his article, and provide it with a description of the shopkeeper. Appellant refused to answer, claiming that the shopkeeper was the source for his article; that disclosure of the information sought by the Grand Jury would, with a high degree of probability, lead to the actual disclosure of his source of information; that by the express provisions of Maryland Code, Article 35,

Section 2, he could not, as a newspaperman, "be compelled to disclose, in any legal proceeding or trial * * * the source of any news or information procured or obtained by him for and published in the newspaper * * *"; and, further, that under the federal and state constitutional guarantees of freedom of speech and press, he possessed a right, as a newspaperman, not to answer the Grand Jury's inquiries.

The State's Attorney promptly instituted constructive contempt proceedings against appellant; he maintained that the information sought by the Grand Jury from appellant was not of his source of news, but involved information based on appellant's personal knowledge obtained by him "solely upon his personal observations." At the hearing on the contempt charge, appellant testified that he was twenty-one years old; that he had been sent by his editors to Ocean City "to obtain a story on how open drug use and sales were in Ocean City"; that his editors had indicated that they had heard rumors that drugs were being used and sold openly on the Boardwalk and anyone "with my length of hair" and of his age, or younger, could obtain drugs simply by being friendly enough with the right people. Pursuant to these instructions, appellant testified that he went to Ocean City where he mingled with people of his own age group, walked around and entered shops; and that his investigative efforts ultimately led him in July of 1971 to the shop and shopkeeper referred to in his article. He testified that he had spoken with the shopkeeper and that she had given him the information published in his article. He stated that he had been told by his editors that he could reveal his identity as a reporter or not, as he wished; and that "at times" he gave away his identity. It was stipulated that appellant was the "customer" referred to in his article who had the conversation with the shopkeeper.

In finding appellant's refusal to answer the Grand Jury's inquiry to constitute a civil contempt, the court noted that there had been no testimony that he did in

fact identify himself to the shopkeeper as a newspaper reporter. The court also found that there had been no testimony that the shopkeeper gave appellant any information based upon the representation or knowledge that he was a newspaperman. The court concluded that the shopkeeper was not a "source" of information for appellant's article within the meaning of Article 35, Section 2; that appellant was a stranger to the shopkeeper and what he heard was not conveyed to him in confidence. The court also concluded that appellant's constitutional rights of free speech and press would not be violated by requiring that he provide the Grand Jury with the information it sought. This appeal followed.

# I

*The Newsman's Statutory Privilege of Non-Disclosure of Sources of News Obtained for Publication*

No privilege was afforded newsmen at common law to conceal from judicial inquiry either the source of their information or the information itself. *Garland v. Torre*, 259 F. 2d 545 (2nd Cir.); *Branzburg v. Pound*, 461 S.W.2d 345 (Ky.); *Beecroft v. Point Pleasant Printing & Pub. Co.*, 197 A. 2d 416 (N.J.); *State v. Donovan*, 30 A. 2d 421 (N.J.); *People v. Sheriff of New York County*, 199 N. E. 415 (N.Y.); Annotation, 7 A.L.R.3rd 591; 3 *Jones on Evidence*, Section 854. Maryland, in 1896, was the first state to enact a statute changing the common law to give a newspaperman the privilege of not revealing the source of information published by him.[2] *State v. Sheridan*, 248 Md. 320, 322. Now codified as Section 2 of Article 35, the statute in its present form provides:

---

2. The statute was passed in apparent response to the jailing, in early 1896, of a newspaper reporter who had obtained information which enabled him to accurately report the proceedings of the Baltimore City Grand Jury. Summoned before the Grand Jury, and asked to reveal the source of his information, the reporter declined on the ground that a newspaperman "never betrays those who give him their confidence." The reporter remained in jail for five days; he was released when the term of the Grand Jury expired. See 36 Va. L. Rev. 61; Editor & Publisher, September 1, 1934, p. 9; Baltimore Morning Sun, June 24, 1972.

"No person engaged in, connected with or employed on a newspaper or journal or for any radio or television station shall be compelled to disclose, in any legal proceeding or trial or before any committee of the legislature or elsewhere, the source of any news or information procured or obtained by him for and published in the newspaper or disseminated by the radio or television station on and in which he is engaged, connected with or employed." [3]

In *State v. Sheridan, supra,* a newsman refused to reveal to the Grand Jury the details of a conversation between him and one Patrick relating to certain suspected irregularities, even though the substance of the conversation had previously been disseminated to the public and Patrick revealed as its source. The lower court held that under the Maryland statute the newsman could not be compelled to answer the Grand Jury's inquiries; that his newspaperman's privilege "of never violating a confidence allowed him to remain silent as to the details of the information Patrick had given him." While the Court of Appeals dismissed the appeal to it from that ruling on grounds of mootness (the Grand Jury's term having expired), it characterized the lower court's conclusion as inexplicable "since the statute makes inviolate only 'the source of any news or information' and not the 'news and information' itself." At page 322. The court in *Sheridan* criticized the holding of the Supreme Court of Pennsylvania in the case of *In Re Taylor,* 193 A. 2d 181, involving a newsman's privilege statute which, like the Maryland statute, protected newsmen from disclosing "the source of any [published] information." In *Taylor* the court concluded, in effect, that the phrase "source of any information," as used in the statute, included not only the identity of a person, but also the information it-

3. As originally enacted by Chapter 249 of the Acts of 1896, the privilege did not cover persons engaged in radio or television news broadcasting; they were, however, afforded the privilege by Chapter 614 of the Acts of 1949.

self. The *Sheridan* court indicated at page 322 that the *Taylor* court "failed to discriminate on the facts and the law between the *source* of the information and the *information*"; it referred to 77 Harv. L. Rev. 556, where the author, expressing a belief that the court in *Taylor* blurred the distinction between the words "source" and "information," as used in the statute, said: (p. 557)

"* * * To ask someone for information as such is to ask what, substantively, he knows about a certain problem; to ask someone for the 'source' of his information is, in effect, to ask how he knows. The reasons for making the answer to the latter inquiry privileged do not necessitate making the answer to the former privileged as well. * * *"

In its opinion in *Sheridan*, the court also referred to 112 U. Pa. L. Rev. 438, where the author, in criticizing the *Taylor* decision, observed that newsman's privilege statutes, like those in force in Maryland and Pennsylvania, merely provide that a newsman cannot be forced to divulge his *sources;* that when it granted the "newsman privilege" the legislature was concerned with the usual case in which an informant makes disclosures under the stipulation that his identity remain unknown; and that unlike other privileged communication statutes, the newsman's privilege statute has as its primary focus the protection of the identity of the informant and not the information itself.

In *State v. Donovan,* 30 A. 2d 421 (N.J.), referred to in *Sheridan* as a decision to be contrasted with *Taylor,* a newsman declined to answer a question propounded to him in a judicial inquiry relating to news articles he had published on the ground that he was protected from such inquiry by a newsman's privilege statute, the provisions of which, in all material respects, are identical to those in the Maryland statute. The court there noted that the source of the news articles was already known to the public; that the newsman's privilege statute, being in

derogation of the common law, was strictly to be construed; that the statute, in terms, protected newsmen only from being compelled to disclose "the source of any information [published] in the newspaper"; and that since the source was known, the newsman could be compelled to answer a question which "did not go to the source of the publication." [4] At p. 426.

*Branzburg v. Pound,* 461 S.W.2d 345 (Ky.),[5] involved a newsman's privilege statute in all material respects identical to the Maryland statute. In that case, a newspaper reporter wrote an article describing in detail his observations of two young persons synthesizing hashish from marihuana. The article stated that the reporter had promised not to reveal the identity of the two hashish makers. Summoned before the Grand Jury, Branzburg was asked to identify the persons about whom he wrote and those in possession of and compounding marihuana; he refused and was held in contempt. On appeal, Branzburg contended that "source of information" should be construed to mean all knowledge received by a newsman no matter what the source; and that when a newsman observes something, the thing observed is itself the source of the information. The court, rejecting Branzburg's arguments, concluded that the statute "granting immunity to a newsman from disclosing the *source of any information* procured or obtained by him, grants a privilege from disclosing the source of the information but does not grant a privilege against disclosing the information itself." At p. 347. The court said:

> "*Information* as used in the statute refers to the things or the matters which a reporter learns and *source* refers to the method by which or to the person from whom he learns them.
>
> "In this case the reporter learned that two men were engaged in the process of making

4. The question sought to elicit from the newsman the means by which the source of the information conveyed releases for publication to the newspaper.
5. Affirmed on other grounds, *Branzburg v. Hayes,* 408 U. S. 665.

hashish. Their identity, as well as the activity in which they were engaged, was a part of the *information* obtained by him, but their identity was not the *source* of the information.

"The actual *source* of the information in this case was the reporter's personal observation. In addition some informant may have provided him with information that at a certain time and place he could observe the process of conversion of marijuana into hashish. If such was the case we have no doubt that the identity of the informant was protected by the statute.

"The reporter, however, was not asked to reveal the identity of any such informant and his privilege from making that disclosure is not in question. He was asked to disclose the identity of persons seen by him in the perpetration of a crime and he refused, urging as a justification for such refusal, that the statute should be given a broad construction extending his privilege against disclosure to all his knowledge of this incident rather than just the source of the knowledge.

\* \* \*

"In all likelihood the present case is complicated by the fact that the persons who committed the crime were probably the same persons who informed Branzburg that the crime would be, or was being, committed. If so, this is a rare case where informants actually informed against themselves. But in that event the privilege which would have protected disclosure of their identity as *informants* cannot be extended beyond their role as informants to protect their identity in the entirely different role as perpetrators of a crime." (pp. 347-348)

Appellant in the present case characterizes the statement of law in *Sheridan* (properly, we think) as dictum. He suggests that the dictum could not withstand critical

examination in a case actually presenting the case for decision. He discounts the force of the holding in *Branzburg* on the ground that the issues were not well considered in that case and, further, because the facts were different from those now before us. He contends that the entire purpose of the Maryland newsman's privilege statute is to permit a reporter to describe acts or words of a source without identifying him. He claims that the statutory privilege is intended to foster publication of such material, and that it is wrong to conclude that anything observed by a reporter must be disclosed on the ground that what he sees is the news itself and not the source. He contends that the information he was seeking in this case—the illegal use of drugs—necessarily involved violations of law; that his only way to locate a source of information was to keep his eyes open for a violation, then approach the person observed for information and thereby obtain a valuable source for material later to be published; that because the reporter learned of the source's identity by personal observations, and the events reported indicated a violation of the criminal laws, does not permit him to be questioned as to the things observed when, if disclosed, they would lead to the identification of his source. He claims that nothing in the statute protecting against compelled disclosure of "the source of any news or information" requires that the source be a "knowing" one. He suggests that a reporter might locate someone of garrulous disposition possessed of information of importance on an issue of public interest and might make use of many things told him in conversations with such a person, even though the source was altogether unaware that he had been talking to a newspaperman. If, in such circumstances, a reporter could not protect his source from revelation, there would be in many cases, as appellant sees it, a tendency on the part of reporters to write stories derived from such a source in a less direct and less accurate fashion than otherwise would be the case; that the purpose would be to reduce the risk of closing off the source; that any such lessening

of accuracy in presentation of the news is to the disadvantage of the public, and the encouragement of a free press, which patently was the basis for the statute's enactment. Appellant acknowledges, on the other hand, that if a reporter chances on an act of violence being perpetrated on the street, he may not claim a newsman's privilege and thereby avoid describing what he saw or decline to identify the perpetrator on the ground that he subsequently described in a newspaper story what he witnessed; in this situation, appellant believes that because the person who committed the act would not have intentionally communicated information to the reporter, the person would not be a "source" and the statute would have no applicability.

The State contends that the statute makes privileged only the source of the newsman's information and does not protect the information itself, whether it be obtained from a protected source or through the reporter's personal observation. It contends that appellant's status as a newsman imparted no special stature to his observations because they could have been made by anyone; that he was not permitted to observe the pipe shop knowingly but in confidence by a source; that he was treated as a prospective purchaser and observed what any other customer who happened into the pipe shop would have observed.

The State contends that the purpose of the statute, apparent from its face, is to encourage the flow of news from sources which might otherwise fear the unfavorable publicity or retribution resulting from their revelation as a source of the news story. It argues that the statute protects the confidence of sources in order to encourage greater dissemination of information; that implicit in the statute is the element of confidentiality; that the ends of the statute are not served where the person claimed to be a source is not even aware that he is speaking to a newspaper reporter. The State claims that the shopkeeper in this case is not a source within the meaning of the statute; that the source of the information

was the appellant's personal observations; that requiring him to disclose the location of the pipe shop and describe the shopkeeper will in no way inhibit the free flow of information to the press because to the shopkeeper appellant was nothing more than a potential customer and the information she imparted to him was not given under a promise that he would protect her anonymity but was given without compunction or reliance upon a promise of anonymity.

The general principle of privileged communications is based, in part, on the fundamental condition that the communication originate in confidence that it will not be disclosed without the communicant's consent. See 8 Wigmore (McNaughton Rev. 1961) Section 2285. The Maryland statute, however, does not protect against the disclosure of communications; it privileges only the source of the information and the privilege is not that of the informant but of the newsman, as the State concedes. See *Brogan v. Passaic Daily News,* 123 A. 2d 473 (N.J.) ; *State v. Donovan, supra.* The statute, on its face, does not purport to protect a newsman from disclosing *only* such sources of news or information published by him that was received in the course of a confidential newsman-informant relationship. On the contrary, while the Legislature may have enacted the statute with the primary purpose in mind of protecting the identity of newsmen's confidential sources, we think the statutory privilege broad enough to encompass any source of news or information, without regard to whether the source gave his information in confidence or not.[6] Consequently, it

---

6. The strong conviction among newsmen that they must not expose an informant who has given information in confidence has long been recognized. Indeed, it is canon of journalistic ethics to which, it is said, newsmen almost unswervingly adhere that they shall "hold sacred and inviolable all information given * * * in a confidential way." See 36 Va. L. Rev. 61, quoting from Editor and Publisher, September 1, 1934, p. 9. As the author of the law review article points out, the journalistic ethic is based on the proposition that if informers feel that newsmen cannot be trusted to protect a confidence, then valuable sources of information will be closed to news-gathering media. Many law review commentators

is for the newsman to determine whether he will disclose the "source" of his news or information, and such disclosure cannot be compelled by requiring that he answer questions aimed, directly or indirectly, toward ascertaining the source's identity. But obviously not all news or information published by newsmen has as its origin a "source" protected by the statute. Where a newsman, by dint of his own investigative efforts, personally observes conduct constituting the commission of criminal activities by persons at a particular location, the newsman, and not the persons observed, is the "source" of the news or information in the sense contemplated by the statute. To conclude otherwise in such circumstances would be to insulate the news itself from disclosure and not merely the source, a result plainly at odds with the Maryland law espoused in dictum in *Sheridan*. We think *Sheridan* correctly interprets the Maryland statute, particularly since, being in derogation of the common law, it requires a strict construction. See *State v. Donovan, supra,* and compare *MacBride v. Gulbro, Adm'x,* 247 Md. 727. As in *Branzburg,* the situs of the criminal activity, and the persons participating in it, was in this case part of the information obtained by the appellant through his own personal observations and, consequently, neither the identity of the shopkeeper nor the location of the shop constituted the "source" of the news or information published by the appellant. Had the substance of appellant's

---

indicate a belief that newsman privilege statutes are predicated on the existence of a confidential relationship between the reporter and his source of information and that the statutes may be justified on the ground that protection of the confidential relationship benefits the public at large by guaranteeing better news reporting. See 46 Oreg. L. Rev. 99; 11 Stanford L. Rev. 54; 9 Clev. Mar. L. Rev. 311; 58 Calif. L. Rev. 1198; 45 Tulane L. Rev. 605. See also *People v. Wolf,* 329 N.Y.S. 291 (Supreme Court, New York County), involving a broadly worded newsman privilege statute against compelled disclosure of "any news or the source of any such news" where the court held "the element of confidentiality" was implicit in the statute, *viz.,* that to raise the claim of privilege, the newsman was required to show that "the information or its sources must be imparted * * * under a cloak of confidentiality, *i.e.,* upon an understanding, express or implied, that the information or its sources will not be disclosed." At p. 297.

information been learned, not by personal observation but been supplied to him by an informant, the identity of that informant would clearly be protected. In the circumstances of this case, that the shopkeeper gave on-the-scene information which revealed her complicity in illegal activities means only that she informed against herself; as in *Branzburg*, that fact cannot be extended to protect her identity as a participant in the illegal activities. We conclude that appellant can lawfully be directed to disclose the location of the pipe shop and describe the identity of all those persons observed by him, including the shopkeeper, who were engaged in the illegal activities; in the posture of this case, these questions do not go to the "source" of the appellant's publication and they must be answered. If the newsman's testimonial privilege is to be broadened, as in New York, to cover disclosure of "any news or the source of any such news" (see *People v. Wolf, supra,* footnote 6), it can only be done by the Legislature.

## II

### *The Alleged Violation of the Constitutional Guarantee of Free Press and Free Speech by Compelling Disclosure of the Newsman's Source*

The appellant contends that where, as here, a newsman is engaged in preparation of a series of articles dealing with illicit use of drugs by young people, and where sources of information may only be ascertained through observation of those who might become sources while engaged in illegal drug practices, it violates the free press and free speech guarantee of the federal and Maryland constitutions to compel a reporter to disclose the identity of a source, some of whose activities he has described in a newspaper article but whose identity he has fully protected. That no such violation of the federal constitutional guarantees exists in such circumstances has now been made clear by the Supreme Court of the United States in *Branzburg v. Hayes, supra* (decided

June 29, 1972). We perceive no distinction between the free speech and press guarantees in Article 40 of the Maryland Declaration of Rights and the First Amendment to the federal constitution; they stand in *pari materia*. *Freedman v. State,* 233 Md. 498. *Cf. Givner v. State,* 210 Md. 484; *Bass v. State,* 182 Md. 496; *Blum v. State,* 94 Md. 375. In the particular circumstances of this case, therefore, appellant's claim to constitutional protection for his source of information is lacking in merit.

*Judgment affirmed; appellant to pay costs.*